```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF PUERTO RICO

 3
     UNITED STATES OF AMERICA,      )
 4                                  )
             Plaintiff,             )
 5                                  )
     -vs-                           ) Case No. 23-CR-063
 6                                  )
     DIEGO FERNANDEZ-SANTOS,        )
 7                                  )
             Defendant.             )
 8   _____)

 9


10              TRANSCRIPT OF JURY TRIAL - DAY FOUR
        HELD BEFORE THE HONORABLE FRANCISCO A. BESOSA
11              UNITED STATES DISTRICT COURT JUDGE
                      DECEMBER 12, 2024
12   _____

13


14                    A P P E A R A N C E S

15

16   FOR THE UNITED STATES OF AMERICA:

17   JULIAN RADZINSCHI, Esq.
     CESAR RIVERA-DIAZ, Esq.
18   Assistant U.S. Attorneys

19   FOR THE DEFENDANT:

20   SAMUEL P. CARRION, Esq.
     IVAN SANTOS-CASTALDO, Esq.
21   ROBERT M. FITZGERALD, Esq.
     Assistant Federal Public Defenders
22

23

24   REPORTED BY:        Tracy L. Binder, RPR
                         Federal Official Court Reporter
25                       United States District Court
                         District of Puerto Rico
```

```
 1              (Proceedings commenced at 9:20 a.m.)
 2              THE COURT:  Good morning.  You may be seated.
 3              THE GALLERY:  Good morning, Your Honor.
 4              DEPUTY CLERK:  Criminal Case 23-063, United States
 5    of America versus Diego Fernandez-Santos for Fourth day of
 6    jury trial.
 7              On behalf of the Government is AUSA Cesar Rivera,
 8    and AUSA Julian Radzinschi.  On behalf of the Defendant is
 9    AFPD Ivan Santos, AFPD Samuel Carrion, and AFPD Robert
10    Fitzgerald.  The Defendant is present in the courtroom and
11    is being assisted by a certified court interpreter.
12              THE COURT:  Government, are you ready to present
13    your next witness?
14              MR. RIVERA:  Yes, Your Honor.  The Government
15    calls Special Agent Jorge Escribano.
16              THE COURT:  Now, Mr. Rivera, remember what I told
17    you.  Go right to the point.
18              MR. RIVERA:  Yes, Your Honor.  And, Your Honor,
19    this witness requires no translation, so it should also --
20              THE COURT:  I didn't hear a word that you said.
21    What?
22              MR. RIVERA:  That this witness does not require
23    translation either, so it should move quicker, too.
24              THE COURT:  Okay.
25              Would you bring the jury in, please.
```

```
1              COURT SECURITY OFFICER:  Yes, Your Honor.

2              THE COURT:  Did the parties receive the chronos?

3    Did you receive the chronos?

4              MR. CARRION:  I did recieve chronos this morning,

5    yes.

6              And, Your Honor, before we begin with this

7    witness, would it be possible to show the jury that exhibit

8    from yesterday that was redacted?  It was AA.

9              THE COURT:  No; we'll get to that.

10                 (The jury enters the courtroom.)

11             THE COURT:  Good morning, ladies and gentlemen.

12   You may be seated.

13             We will continue now with the presentation of

14   evidence by the Government.  Who is your next witness?

15             MR. RIVERA:  The Government calls Special Agent

16   Jorge Escribano, Your Honor.

17             THE COURT:  Please take Agent Escribano's oath.

18             DEPUTY CLERK:  Please state your name for the

19   record.

20             THE WITNESS:  Jorge Escribano.

21                      JORGE ESCRIBANO,

22        having been first duly sworn, testified as follows:

23             THE WITNESS:  I do.

24             THE COURT:  You may proceed, Mr. Rivera.

25             MR. RIVERA:  Thank you, Your Honor.
```

```
 1                      DIRECT EXAMINATION
 2    BY MR. RIVERA:
 3    Q    Could you please state your full name for the record?
 4    A    Jorge Escribano.
 5    Q    And who is your employer, Mr. Escribano?
 6    A    ATF, the Bureau of Alcohol, Tobacco, Firearms, and
 7         Explosives.
 8    Q    How long have you been with ATF?
 9    A    Close to seven years.
10              THE COURT:  I'm sorry?
11              THE WITNESS:  Seven years.
12              THE COURT:  Please put the microphone closer to
13    you.
14    BY MR. RIVERA:
15    Q    What is your position at ATF?
16    A    Special agent.
17    Q    During your tenure with ATF, have you always been a
18         special agent?
19    A    Yes, sir.
20    Q    Before joining ATF, where did you work?
21    A    I worked as an investigator for the special independent
22         prosecutor board for a period of four years.  And prior
23         to that, I was a state deputy marshal with the Court of
24         Appeals.
25    Q    How long were you a state deputy marshal?
```

```
 1   A    Two years.
 2              THE COURT:  State deputy marshal here in Puerto
 3        Rico?
 4              THE WITNESS:  Yes, sir.
 5   BY MR. RIVERA:
 6   Q    You mentioned you're currently a special agent with the
 7        ATF.  Could you please describe your duties for the
 8        jury.
 9   A    Well, I investigate Federal firearms violations, among
10        other Federal violations.
11   Q    And as part of your work with ATF, have you received
12        any specialized training related to the identification
13        of firearms and ascertaining where firearms and
14        ammunition are manufactured?
15   A    Yes.  We received -- as special agents at ATF, we
16        receive a basic course in special agent basic training
17        course.  And after that, we receive what is called --
18        some agents receive what is called a Nexus course,
19        where during the course of a week, we dive into the
20        manufacturing and research and identification of
21        firearms.
22   Q    Okay.  Let's take those one by one.  Can you please
23        tell us, as it pertains to basic training, what you
24        learned as it relates to identification of firearms and
25        ammunition.
```

| | | |
|---|---|---|
| 1 | A | Well, the placement of importer and exporter markings |
| 2 | | in firearms, serial numbers in firearms, or any |
| 3 | | identification that is required to be put into |
| 4 | | firearms. |
| 5 | Q | And how long is basic training? |
| 6 | A | Um, six -- close to six months. |
| 7 | | THE COURT:  I'm sorry? |
| 8 | | THE WITNESS:  Close to six months. |
| 9 | BY MR. RIVERA: | |
| 10 | Q | Do you get any practical testing during basic training? |
| 11 | A | Yes. |
| 12 | Q | What kind? |
| 13 | A | Well, they hand you over different firearms and they |
| 14 | | hand you over pistols, revolvers, shotguns, and |
| 15 | | different type of rifles so you can identify the |
| 16 | | placement of importer markings and serial numbers. |
| 17 | Q | Do you do that with ammunition as well? |
| 18 | A | Yes. |
| 19 | Q | What about Nexus school, how does that training work? |
| 20 | A | Oh, it's basically a refresher of the basic training |
| 21 | | course, but with the addition of doing the research of |
| 22 | | the serial number and the importer marking to determine |
| 23 | | if the firearm was manufactured in a state in the |
| 24 | | United States or outside of the United States. |
| 25 | Q | And how long is Nexus training? |

```
 1    A    A week.

 2    Q    Do you review any literature during Nexus training?

 3    A    Yes.

 4    Q    What kind?

 5    A    Well, different type of encyclopedias, books that have

 6         information about different manufacturers, and the cost

 7         of the firearms, and the history of firearms and

 8         ammunitions.

 9    Q    To go into Nexus school, do you have to take a test?

10    A    Yes, sir.

11    Q    What kind of test?

12    A    Reading exam before and after.

13    Q    Is there a passing grade?

14    A    Yes.

15    Q    Did you pass it?

16    A    Yes, sir.

17    Q    And once you're done with Nexus school, do you take

18         another test?

19    A    Yes.  At the end of the course, you've got a written

20         exam and then a practical exam.

21    Q    And how did it go for you in those two?

22    A    Well, I passed.

23    Q    Did you receive --

24              THE COURT:  What does the practical exam consist

25    of?
```

```
 1              THE WITNESS:  Well, the practical exam is they
 2   hand you a firearm and you have to do like a mock trial and
 3   do research for the firearm, and then you go to what is
 4   called a mock court and the instructors will be prosecutors,
 5   you know, defense attorneys, and a judge.  They ask you
 6   questions so you can simulate what a Nexus expert does in
 7   doing court proceedings.
 8              THE COURT:  Which is what?
 9              THE WITNESS:  Which is testify as to the firearm.
10              THE COURT:  As to where it --
11              THE WITNESS:  Where it was manufactured, correct.
12              THE COURT:  So the practical exam basically is a
13   mock -- moot court.
14              THE WITNESS:  Yes, sir.
15              THE COURT:  Okay.
16   BY MR. RIVERA:
17   Q    How many firearms and ammunition did you examine during
18        your week-long training at Nexus school?
19   A    From beginning to end, more than ten, more than ten.
20        And for the practical exam, three.
21   Q    And as part of your Nexus training, did you visit any
22        weapons and ammunition factories?
23   A    The Remington factory
24   Q    And where is that?
25   A    It was at Huntsville, Alabama.
```

| | | |
|---|---|---|
| 1 | Q | Could you tell the jury about your visit to that |
| 2 | | factory. |
| 3 | A | Well, the Nexus class went to the Remington |
| 4 | | manufacturer facility.  Remington is a manufacturer of |
| 5 | | ammunition and firearms. |
| 6 | Q | And what do you learn there? |
| 7 | A | How the ammunitions are made, how frames and receivers |
| 8 | | are made, and the process they go through to being from |
| 9 | | scrap metal to being functioning firearms, receivers, |
| 10 | | and ammunitions. |
| 11 | Q | Did you go to any factories in Puerto Rico? |
| 12 | A | No. |
| 13 | Q | Are there any? |
| 14 | A | No. |
| 15 | Q | At the end of your Nexus training, did you receive any |
| 16 | | certification? |
| 17 | A | Yes, sir. |
| 18 | Q | Okay.  Apart from your specialized training, how many |
| 19 | | times have you examined a weapon to determine whether |
| 20 | | it qualifies as a firearm under Federal law? |
| 21 | A | Well, in more than 20 cases. |
| 22 | Q | And how many times have you examined a firearm to |
| 23 | | determine the place of manufacture? |
| 24 | A | Same. |
| 25 | Q | How many times have you determined whether a projectile |

| | | |
|---|---|---|
| 1 | | qualifies as ammunition? |
| 2 | A | Probably done close to seven to ten reports on that. |
| 3 | Q | And how many times have you examined ammunition to |
| 4 | | determine the place of manufacture? |
| 5 | A | The same. |
| 6 | Q | When did you first own a firearm? |
| 7 | A | I owned a firearm in 2010. |
| 8 | Q | Have you owned a firearm from 2010 up until today? |
| 9 | A | Yes, sir. |
| 10 | Q | So it's been approximately 14 years you've owned a |
| 11 | | firearm? |
| 12 | A | Yes, sir. |
| 13 | Q | As part of your work with ATF, do you carry a firearm? |
| 14 | A | Yes, sir. |
| 15 | Q | How long have you carried a firearm for ATF? |
| 16 | A | All the time I've been with ATF. |
| 17 | Q | As part of your work, do you interact with firearms and |
| 18 | | ammunition manufacturers? |
| 19 | A | Yes, sir. |
| 20 | Q | And as part of your work, do you also interact with |
| 21 | | ammunition and firearms dealers? |
| 22 | A | Yes, sir. |
| 23 | Q | Do you ever request tracing information to determine |
| 24 | | manufacture and interstate shipment of firearms? |
| 25 | A | Yes, sir. |

```
1    Q    How frequently?

2    A    When having a serial number, we contact the

3         manufacturer with the serial number to determine if

4         that firearm, that serialized firearm was manufactured

5         in Puerto Rico or not.

6    Q    Do you request tracing information to determine the

7         manufacturer and interstate shipment of ammunition as

8         well?

9    A    Yes.

10   Q    How many times have you been offered as an expert in

11        the identification of firearms and/or interstate or

12        foreign movement of firearms and ammunition?

13   A    Three times I've testified.

14   Q    On those three occasions that you've been offered as an

15        expert, were you always admitted as such?

16   A    Yes.

17             MR. RIVERA:  Your Honor, at this time the

18   Government would move Jorge Escribano as an expert in the

19   identification of firearms and the interstate Nexus of

20   firearms and ammunition.

21             THE COURT:  Any objection?

22             MR. CARRION:  Your Honor, we have no objection to

23   this witness's qualification as an expert.

24             THE COURT:  Okay.  Ladies and gentlemen, Agent

25   Escribano is going to testify as an expert.  I'm qualifying
```

```
1    him as an expert in identification of firearms and

2    ammunition, and the interstate Nexus of firearms and

3    ammunitions.  As an expert, apart from his basic testimony,

4    he can give an opinion.  Okay?  You understand that?

5              All right.  Very well, go ahead.

6              MR. RIVERA:  May we please show defense counsel

7    Government's Exhibit 22, please.

8              Can we please show Special Agent Escribano

9    Government's Exhibit 22.

10             Can we take it out of the bag, please.

11             THE COURT:  Yes.  This is Exhibit 22?

12             MR. RIVERA:  Correct, Your Honor, yes.

13   BY MR. RIVERA:

14   Q    Special Agent Escribano, do you recognize Government's

15        Exhibit 22?

16   A    Yes, sir.

17   Q    What is it?

18   A    It's an AK-type rifle.

19             THE COURT:  I'm sorry?

20             THE WITNESS:  AK-type rifle.

21   Q    How do you know?

22   A    Well, it has the characteristics of an M70 Yugoslavian

23        rifle.  It has a folding stock which can be extended

24        upon pressing a release button and extending the stock.

25             THE COURT:  Would you do that, please, for the
```

1    jury.

2            THE WITNESS:  Yes, sir.

3            Folding stock.

4            THE COURT:  Thank you.

5    BY MR. RIVERA:

6    Q    Have you examined this firearm before?

7    A    Yes, sir.

8            THE COURT:  This particular firearm?

9            THE WITNESS:  Yes, sir.

10   Q    What was your analysis of it?

11   A    Well, the -- upon inspection of the firearm and the

12        markings in the firearm and the characteristics of the

13        firearm, it was determined by myself that even though

14        it doesn't have a serial number attached to it, or is

15        visibly seen where there is supposed to be a serial

16        number to it, there are characteristics that possess is

17        not consistent with any firearm that is manufactured in

18        Puerto Rico.

19   Q    So what is your opinion as to the place of manufacture

20        regarding this firearm?

21   A    Outside of.  Also it has the consistence of the rivets

22        in the frame, in the receiver of the firearm, that

23        suggest that is also manufactured outside of Puerto

24        Rico.

25   Q    Okay.  You mentioned rivets and receivers.

```
1                THE COURT:  Would you say that again?  Would you
2    say that again?  I didn't understand what you said.
3                THE WITNESS:  Okay.
4                THE COURT:  You have to speak clearly,
5    Mr. Escribano.
6                THE WITNESS:  Yes, sir.  Sorry about that.
7                The rivets in the --  sorry about that -- so I can
8    show -- the firearm has rivets in the receiver part of the
9    rifle.
10   Q    I'll stop you right there.  What is a receiver?
11   A    A receiver is the --
12               THE COURT:  Stand up for the jury.
13   A    The receiver is part of the rifle.
14               THE COURT:  Mr. Escribano, stand up so that the
15   jury can see the firearm.
16               THE WITNESS:  Okay.
17               THE COURT:  Okay.  Now explain what -- keep
18   standing and explain what you -- what the receiver is.
19               THE WITNESS:  The receiver of this firearm is
20   where you place the fire mechanism.  The fire mechanism is
21   what makes the gun work and what houses the trigger, this
22   area right here (indicating).
23   BY MR. RIVERA:
24   Q    You were talking about rivets.
25   A    In this particular rifle, there are rivets that hold
```

1    the rifle together.  They need to be attached to this

2    receiver with a specific pressure.  That is done either

3    by hand with a special machinery or equipment, or by

4    the machinery itself.  If you apply too much pressure,

5    the fire mechanism will not function and the firearm

6    would not work.  If you put little pressure, it can be

7    undone and by the third or fourth round that goes off.

8    Because every time you fire a firearm, a mini explosion

9    happens in the part of the inside of the firearm.  If

10   it doesn't have the precise pressure, it can come

11   apart.

12        THE COURT:  Thank you.

13   Q   What do the rivets in this firearm indicate to you?

14   A   They were, you know, professionally placed by the

15       manufacturer, or a place that has industrial machinery.

16   Q   You said this firearm has no serial number?

17   A   Right.

18   Q   Can you explain why?

19   A   Well -- well, in the receiver, it usually has a serial

20       number.  However, based on the cover plate, you can see

21       there's a numerational -- or the final numbers of the

22       serial number that usually is attached to the receiver.

23       In addition, the -- the internal parts of the mechanism

24       has the same serial number to indicate the -- the parts

25       of the serial number that matches the cover plate.

1    The reason being is that those -- those

2    numbers on the cover plate were assigned to soldiers.

3    When they took the rifle apart for maintenance or

4    cleaning or inspection in the field, they take off the

5    cover plate, put it aside and they conduct their

6    inspection, their cleaning, et cetera.  When they put

7    it back together, since it was done with multiple

8    soldiers, they grab -- instead of knowing their whole

9    serial number of their rifle, they will grab the cover

10    plate, say, oh, the last four numbers, such and such,

11    this is mine, it's assigned to me, and they grab their

12    cover plate and put it back.

13  Q    What does that number tell you about this firearm?

14  A    Well, those soldiers were Yugoslavian soldiers at the

15    time.

16  Q    Does that tell you anything about the origin of this

17    firearm?

18  A    That it's not manufactured in Puerto Rico.

19  Q    Now, can you elaborate on your process of analysis of

20    this firearm.

21  A    Well, yes.  Upon receiving the firearm, I inspect the

22    characteristics.  I extended the folding stock,

23    conducted a dry fire test, took apart the cover plate,

24    inspect for importer markings, exporter markings, and

25    serial numbers, and observed that there were some

```
 1              attachments to it that are aftermarket attachments.
 2              And there were -- supposed to be the serial number of
 3              the firearm is not there.  Either it's grind off or
 4              painted over it.
 5         Q    You mentioned a dry fire.  What is a dry fire test?
 6         A    A dry fire test is when you make a determination to
 7              render the gun safe.  And when the firearm is
 8              completely unloaded and you racked the bolt, or in the
 9              pistols, you rack the slide, and you pull the trigger
10              to hear the fire mechanism.
11         Q    And you mentioned attachments to this firearm.  What
12              kind of attachments does it have?
13         A    Well, it has a quad rail of Guntec, which is designed
14              to attach either lights or sights that are accessories
15              for firearms.  Or use it as a forehand grip, which
16              while you fire, the mechanism in the firearm heats up
17              the firearm and makes it hard to grab.  Some
18              aftermarket parts, when you attach it, you can grab the
19              firearm while it's still heat up.  In this case, like a
20              forehand grip like this one.
21         Q    Can you show that part to the jury?
22         A    Yes, sir.  This part right here (indicating.)  You can
23              attach lights on either side, or you can attach an
24              optic sight, which is the sight picture you see when
25              you had to insert, you know, a red dot to it.  Even
```

```
1              though it has its iron sights.
2      Q    Is that firearm manufactured with that accessory?
3      A    Not this model.
4      Q    You mention a ground-off or painted-off serial number.
5           Can you expand on that?
6      A    Yes, because when -- you can see that --
7               THE COURT:  Stand up so we can see.
8      A    You can see that usually in this part of the firearm
9           mechanism, serial numbers is placed.  Also -- also in
10          this area right here (indicating), it usually appears
11          the serial number, and it doesn't.  And it has like a
12          part that's -- that is like -- looks like it's painted
13          on, like somebody painted black on it.  Because what
14          you see on the folding stock, it shows the -- like it
15          grinds off the paint that it was painted on, it shows
16          silver instead of black.
17     Q    When these firearms are manufactured, are they
18          manufactured with serial numbers?
19     A    They're manufactured with serial numbers.
20     Q    Is that a yes or a no?
21     A    Yes.
22     Q    Okay.  So what is your opinion as to whether this
23          firearm traveled in interstate or foreign commerce
24          before arriving in Puerto Rico?
25     A    That it did.
```

| | | |
|---|---|---|
| 1 | Q | Are you familiar with the definition of a firearm under |
| 2 | | Federal law? |
| 3 | A | Yes, sir. |
| 4 | Q | Can you tell us what it is? |
| 5 | A | Any weapon, including a starter gun, that is readily |
| 6 | | designed or maybe readily ready to expel a projectile |
| 7 | | by the action of an explosive; any firearm or receiver |
| 8 | | of any such weapon; a muffler or silencer or any |
| 9 | | destructive device. |
| 10 | Q | Basically from your understanding of the firearm, does |
| 11 | | this AK-type rifle qualify as a firearm under Federal |
| 12 | | law? |
| 13 | A | Yes, sir. |
| 14 | Q | Can we show -- can we take Exhibit 22 away from Special |
| 15 | | Agent Escribano, please. |
| 16 | | Special Agent Escribano, what caliber is that |
| 17 | | rifle? |
| 18 | A | 7.62 by 39. |
| 19 | Q | Can we show Special Agent Escribano Government's |
| 20 | | Exhibit 26, please. |
| 21 | | Showing you Government's Exhibit 26, do you |
| 22 | | recognize that? |
| 23 | A | Yes, sir. |
| 24 | Q | What is it? |
| 25 | A | This is the ammunition I inspected to conduct the Nexus |

```
 1              report.
 2    Q    Can you explain to us how you analyze those bullets?
 3    A    Upon receiving the ammunition, HSI agents took it out
 4              of the bag, I placed it in the area where I was
 5              inspecting the ammunition and checked the headstamps
 6              one by one.  The headstamps of ammunition -- can I take
 7              one so I can show what it is?
 8    Q    Could you please open the whole thing so he has access
 9              to everything.
10    A    All right.  All ammunition has what is called a
11              headstamp.  A headstamp is where the manufacturer
12              either marks, identifies himself and puts the caliber
13              on -- around the headstamp area of the ammunition.  In
14              this part, I inspected every single round, took me
15              time, but I checked every single round and it was done
16              by one manufacturer, and he puts his caliber and name
17              on it, plus an importer marking.  And it's on the
18              headstamp.
19              MR. RIVERA:  Could we please have access to the
20    ELMO so we can show the jury?
21              THE COURT:  Go ahead.
22    A    And as you can see in the picture, it has the importer
23              marking, the manufacturer name and the caliber.
24    Q    And what is the caliber?
25    A    7.62 by 39.
```

1  Q    Does that match the previous rifle you had in your

2       hand?

3  A    Yes, sir.

4  Q    And what's the manufacturer of this ammunition?

5  A    Outside of Puerto Rico.

6  Q    What's the name?

7  A    Tulammo.

8  Q    Where do they manufacture?

9  A    In Europe.

10  Q    And you mentioned importer markings.

11  A    Yes.  Between the 7.62 by 39 and Tulammo name, there's

12       a marking there, it's a symbol, and that's how they

13       identify -- that is an importer marking.

14  Q    Can we show the witness Government's Exhibit 8.

15       THE COURT:  You can remove the ammunition and

16  return it, if you don't need it anymore.

17       THE WITNESS:  (Complying.)

18  Q    Showing you Government's Exhibit 8.  Do you recognize

19       the ammunition in this picture?

20  A    Yes.

21  Q    Did you examine that ammunition?

22  A    Yes, sir.

23  Q    And what was your conclusion regarding that ammunition?

24  A    On all the ammunitions, they were manufactured outside

25       of Puerto Rico.

1    Q    What was your conclusion regarding the interstate or

2         foreign commerce of this ammunition?

3    A    That it traveled.

4    Q    That it traveled?

5    A    Interstate and foreign commerce.

6    Q    Are there any ammunition manufacturers in Puerto Rico?

7    A    No.

8    Q    Do you remember the calibers of ammunition that you

9         examined?

10   A    Yes, sir.

11   Q    Which were they?

12   A    7.62 by 39, 9-millimeter, .40 caliber, and 5.56.

13            THE COURT:  What is 5.56?

14            THE WITNESS:  5.56 is the ammunition that is used

15   on rifles of the AR-15 or M4 platform.  5.56 is for the

16   military grade, and the 2.23 is for the civilian aspect of

17   the rifle, but it's the same ammunition.

18   Q    You mentioned you examined 5.56, .40 caliber, and

19        9-millimeter.  Do those three calibers match the rifle?

20   A    No.  Only the 7.62 by 39.

21   Q    Did you make any reports -- any Nexus reports to the

22        firearms and the ammunition?

23   A    Yes, sir, I did.

24   Q    If you're able to see those reports, would you

25        recognize them?

```
1    A    Yes, sir.

2    Q    Can we show defense counsel Government's ID 18.

3              THE COURT:  Before we do that.  Put the Exhibit 8

4    back on the --

5              Looking at Exhibit 8, which is the display in

6    which ammunition is included, can you circle the ammunition

7    which is caliber 7.62 x 39.

8              THE WITNESS:  (Complying.)

9              THE COURT:  Can you circle with another color the

10   ammunition which is 5.56.

11             THE WITNESS:  Where do I choose the other color?

12             MR. RIVERA:  Towards the bottom, there's the

13   palette.

14             THE WITNESS:  Oh, I got it.  Got it, got it.

15             (Complying.)

16             THE COURT:  And with another color, circle the

17   9-millimeter caliber ammunition.

18             THE WITNESS:  I would have to zoom in on the

19   ammunitions that are --

20             THE COURT:  Okay, that's okay.

21             THE WITNESS:  But generally --

22             THE COURT:  That's okay.  The rest of the ones

23   that you did not circle are either .40 or 9-millimeter

24   ammunition.

25             THE WITNESS:  Correct.
```

```
 1              THE COURT:  All right.  Let's print this as
 2    Government's Exhibit 8 -- what's the letter?
 3              DEPUTY CLERK:  8C.
 4              THE COURT:  8C.  And -- in which Agent Escribano
 5    has circled in green the 7.62 x 39 ammunition, and in red,
 6    the 5.56 ammunition.
 7              DEPUTY CLERK:  (Complying.)
 8              MR. RIVERA:  May I proceed?
 9              THE COURT:  Go ahead.  Next question.  You can
10    eliminate this and go back to -- I believe you asked for
11    Exhibit 18.
12              MR. RIVERA:  ID 18 to defense counsel only,
13    please.
14    BY MR. RIVERA:
15    Q    Before we move on to ID 18, Special Agent Escribano, if
16         the firearm and ammunition were not manufactured in
17         Puerto Rico, how do they arrive in Puerto Rico?
18    A    Through interstate or foreign commerce.
19              MR. RIVERA:  Do we have ID 18 for defense counsel?
20              Do you see it?
21              MR. CARRION:  No objection to its admission.
22              THE COURT:  Without objection, admitted as
23    Government's Exhibit 18.
24              MR. RIVERA:  Can we post to the jury?
25              DEPUTY CLERK:  (Complying.)
```

```
 1    BY MR. RIVERA:

 2    Q    Special Agent Escribano, can you see Government's

 3         Exhibit 18 on your screen?

 4    A    Yes, sir.

 5    Q    What is it?

 6    A    It's my interstate Nexus report for the AK rifle.

 7    Q    Can we scroll to the last page.  What was your

 8         conclusion regarding this AK-type rifle?

 9    A    That it's a firearm and it's not manufactured in the

10         Commonwealth of Puerto Rico.

11    Q    Can we show defense counsel Government's ID 19, please.

12              THE COURT:  Wait a minute.  Let me see this.

13              Okay.

14    BY MR. RIVERA:

15    Q    Can we show ID 19 to defense counsel.

16              MR. CARRION:  Likewise, no objection to its

17    admission.

18              THE COURT:  Without objection, admitted as

19    Government's Exhibit 19.

20    BY MR. RIVERA:

21    Q    Special Agent Escribano, can you see Government's

22         Exhibit 19 on your screen?

23    A    Yes, sir.

24    Q    What is it?

25    A    It is my Nexus report for the ammunition.
```

```
 1    Q    What was your conclusion regarding the ammunition?
 2    A    That they're not manufactured in Puerto Rico, and that
 3         they are ammunition.
 4    Q    Can we scroll to the second page, please.  There's --
 5              DEPUTY CLERK:  Your Honor --
 6              MR. RIVERA:  Okay.  The jury cannot see.
 7                  (Pause in proceedings.)
 8              DEPUTY CLERK:  Your Honor, may I have just one
 9    moment to reset the system?
10                  (Pause in proceedings.)
11              THE COURT:  Okay.  All right.  Exhibit 19.  Go
12    ahead.
13    BY MR. RIVERA:
14    Q    Can we scroll to the second page of Exhibit 19.
15              Special Agent Escribano, under Exhibit 11, you
16         begin to describe .40 caliber ammunition, and then you
17         mention Exhibit 3.  Can you explain that?
18    A    It was an oversight, a typo.
19    Q    Okay.
20    A    It was supposed to say that it's. 40 caliber instead of
21         the 9 millimeter.  And Exhibit 3, it's supposed to say
22         Exhibit 11.
23    Q    Can you tell us where it should say Exhibit 11?
24    A    On the top, on the bullet point says Exhibit 11, rounds
25         of .40 caliber ammunition.  And on the next paragraph
```

```
 1              it says only three different markings appear on the
 2              headstamps, and it's supposed to say Exhibit 11A,
 3              Exhibit 11B, and then Exhibit 11C.
 4     Q    Can you please underline where it should say
 5          Exhibit 11.
 6     A    Where it says or it should?
 7     Q    Where it should say Exhibit 11.
 8     A    (Complying.)
 9              MR. RIVERA:  Can we have this printed and marked
10     as Government's Exhibit 19A, please.
11              THE COURT:  Just this page?
12              MR. RIVERA:  Yes.
13              THE COURT:  Okay.  Print it out as Exhibit 19A,
14     which is marked by Agent Escribano and he explained that
15     where it says Exhibit 3A, 3B, and 3C, it should read
16     Exhibit 11.
17              Okay.  Go ahead.
18     BY MR. RIVERA:
19     Q    Special Agent Escribano, under "Findings," paragraph
20          number 3, you've listed all the places where the
21          ammunition to be examined came from.  Could you tell us
22          what those places are?
23     A    In Exhibit 3A, it's Arkansas, United States;
24          Exhibit 3B, in Mexico; Exhibit 3C, Idaho, United
25          States; Exhibit 9, Russia; Exhibit 10, Mexico;
```

```
 1              Exhibit 11A, Minnesota, United States; Exhibit 11B,

 2              Italy; Exhibit 11C, Idaho, United States.

 3    Q    Arkansas, Mexico, Idaho, Russia, Minnesota, Italy, and

 4         Idaho.  None of those are in Puerto Rico; correct?

 5    A    Correct.

 6              MR. RIVERA:  No further questions.

 7              THE COURT:  Cross-examination?

 8              MR. CARRION:  Yes, Your Honor.

 9                        CROSS-EXAMINATION

10    BY MR. CARRION:

11    Q    Good morning, Agent Escribano.

12    A    Good morning, sir.

13    Q    You discussed a little bit on direction examination

14         about your basic training.  I want to talk a little bit

15         about the practical examination that you received in

16         identifying firearms.

17              In the practical examination there was a component

18         where you actually had to pick up the firearm and

19         analyze it.

20    A    Yes, sir.

21    Q    And part of that component was you had to go out to the

22         range and actually fire the weapon.

23    A    No, we didn't fire the weapon.

24    Q    Okay.  So there's no -- so you're saying there's no

25         shooting component to that examination.
```

```
1    A    No.

2    Q    Okay.  And you also mentioned that during interstate

3         Nexus training, you toured the Remington facility?

4    A    Yes, sir.

5    Q    Now, Remington is an American firearms manufacturer?

6    A    Yes, sir.

7    Q    Remington, according to your knowledge, does not

8         manufacture any AK-style weapons.

9    A    No.

10   Q    Remington doesn't have, as far as you know, any

11        presence in Europe, any manufacturing facilities in

12        Europe.

13   A    I would have to verify it, but for right now, no.

14   Q    No.

15             THE COURT:  What did you -- what -- I understood

16        that you said that you toured the Remington factory for

17        ammunition, not firearms.  Am I correct?

18             THE WITNESS:  We observed -- we observed parts of

19        frames of ARs, of automatic rifles -- I mean, assault

20        rifles.

21             THE COURT:  AR rifles.

22             THE WITNESS:  Yeah, but the frame, not the

23        whole -- not the whole firearm build.

24             THE COURT:  They're not AK rifles.

25             THE WITNESS:  Correct.
```

```
 1    BY MR. CARRION:
 2    Q    Now, sir, you mentioned that there were -- that you
 3          were unable to identify a serial number related to the
 4          rifle that you examined in this case.
 5    A    Correct.  It was ground off.
 6    Q    Now, serial numbers obviously are very helpful in
 7          identifying the type of firearm, the manufacturer of
 8          the firearm.
 9    A    Yes, sir.
10    Q    Now, you would agree that without the serial number,
11          it's going to be more difficult to identify where that
12          rifle was manufactured.
13    A    Correct.
14              THE COURT:  But is it difficult to indicate that
15    it was not manufactured in Puerto Rico?
16              THE WITNESS:  No.  Based on the characteristics of
17    the rifle, no.
18    BY MR. CARRION:
19    Q    Now, sir, some of the issues that you might encounter
20          with a rifle that doesn't have a serial number is that
21          you can't cross reference certain -- the manufacture's
22          manual that's associated with the rifle.
23    A    Correct.
24    Q    Now, in this case, you were unable to identify the
25          manufacturer of the rifle.
```

```
1    A    Correct.

2    Q    And if you can't identify the manufacturer of the

3         rifle, you can't necessarily pinpoint the country of

4         origin of the rifle.

5    A    I cannot pinpoint the country of origin, but based on

6         the characteristics on the receiver of the rifle, I can

7         determine that it's not -- there's no manufacturer in

8         Puerto Rico that does that rifle.

9    Q    Right.  And you mentioned that it was a

10        Yugoslavian-style rifle.  But you can't say that that

11        rifle was manufactured in Yugoslavian.

12             THE COURT:  Approach the bench.

13                 (Bench conference commences.)

14             THE COURT:  The important thing here is that it

15   wasn't manufactured in Puerto Rico, so I'm not going to

16   allow any more questions about whether it's Yugoslavian or

17   what.

18             MR. CARRION:  I'll move it along, Your Honor.

19                 (Bench conference concludes.)

20   BY MR. CARRION:

21   Q    Now, sir, as part of your analysis in this case, you

22        consulted certain literature?

23   A    Yes, sir.

24   Q    Books?

25   A    Yes, sir.
```

```
1    Q    Periodicals?

2    A    Yes, sir.

3    Q    Specifically the Blue Book of Gun Values?

4    A    Yes, sir.

5    Q    Shooters Bible?

6    A    Yes, sir.

7    Q    Gun Digest?

8    A    Yes, sir.

9    Q    The Gun, by C.J. Chivers, is it?

10   A    Yes, sir.

11   Q    Military Firearms, by Phillip Peterson?

12   A    Yes, sir.

13   Q    Gun Traders Guide?

14   A    Yes, sir.

15   Q    And the Ammo Encyclopedia, by Michael Bussard?

16   A    Yes, sir.

17   Q    And in this case you also had access to the Center of

18        International Arms.  Is that right?

19   A    Center of International Arms.  Century --

20   Q    Essentially, a center where you can call in to -- where

21        they can help you to identify the make or model of a

22        gun.

23   A    I didn't call them.

24   Q    Okay.  But you have access to that.

25   A    Um, I don't have -- there's no -- there's no list that
```

```
1            I can call out of.  I just reach to the manufacturer
2            that I see on the firearm.
3    Q      But in this case, even after consulting all of that
4            literature that we just discussed, it was still -- you
5            were still unable to identify the manufacturer of this
6            rifle.
7                THE COURT:  Look.  I told you not to ask -- he
8        said it was not manufactured in Puerto Rico.  That's enough.
9                MR. CARRION:  That was my last question on this
10       topic.
11       BY MR. CARRION:
12   Q      I wanted to show you some of the exhibits that the
13           Government showed you recently.  I'm going to put on
14           the projector Government's Exhibit 8.
15                Now, Agent Escribano, there's one magazine in this
16           picture that's compatible with the rifle that you
17           examined.  Is that right?
18   A      Yes, sir.
19   Q      Could you just circle the one magazine in this picture
20           that's compatible with that rifle.
21   A      (Complying.)
22                MR. CARRION:  Your Honor, would we be able to
23       print this exhibit as defense -- I believe we're up to N, as
24       in Nancy, double N.
25                THE COURT:  Double N?
```

1            MR. CARRION:  Double N.  And the record reflect

2    that the blue circled magazine is the only magazine that is

3    compatible with this rifle.

4            THE COURT:  Out of Exhibit 8, we're going to print

5    this -- the exhibit with Agent Escribano's circle around the

6    one magazine that is compatible with the rifle as

7    Defendant's Exhibit NN.

8            MR. CARRION:  Your Honor, I have no more questions

9    for Agent Escribano.

10           Thank you, sir.

11           THE WITNESS:  Thank you.

12           THE COURT:  Agent Escribano, how many rounds does

13   that magazine hold?

14           THE WITNESS:  Usually they hold between 20 to 30

15   rounds.

16           THE COURT:  Is that the magazine that comes with

17   that type of rifle when it's purchased?

18           THE WITNESS:  Yes, sir.

19           THE COURT:  Okay.

20           Redirect?

21           MR. RIVERA:  Briefly if I may, Your Honor.

22                       REDIRECT EXAMINATION

23   BY MR. RIVERA:

24   Q    I'm going to be taking off double N from the --

25           THE COURT:  Go ahead.

```
1    Q    Can we show Special Agent Escribano Government's

2         Exhibit 24, please.

3              Can you please take it out of the bag and hand it

4         over to Special Agent Escribano, please.

5              THE COURT:  What is Exhibit 24?  The magazine?

6              MR. RIVERA:  Correct, Your Honor.

7    BY MR. RIVERA:

8    Q    Special Agent Escribano, what is Exhibit 24?

9    A    An AK-type magazine.

10   Q    How many rounds does that fit?

11   A    20 to 30.

12             THE COURT:  How many?

13             THE WITNESS:  20 to 30, close to 30.

14   Q    What caliber ammunition?

15   A    7.62 by 39.

16   Q    Does that caliber and does that magazine fit the rifle

17        you just had in your hand previously?

18   A    Yes, sir.

19             MR. CARRION:  Asked and answered.

20             MR. RIVERA:  I never asked about the magazine,

21   Your Honor.

22             THE COURT:  What?

23             MR. RIVERA:  Defense counsel has objected as asked

24   and answered.  I have never asked about the magazine fitting

25   into the rifle.
```

```
 1                    THE COURT:  Overruled.
 2    BY MR. RIVERA:
 3    Q    Does that magazine fit into the rifle?
 4    A    Yes, sir.
 5    Q    And how certain are you the ammunition and firearm
 6         traveled through interstate and foreign commerce?
 7                    MR. CARRION:  Objection.  Asked and answered.
 8                    THE COURT:  Sustained.
 9                    MR. RIVERA:  No further questions, Your Honor.
10                    THE COURT:  Agent Escribano, thank you very much
11    for your testimony.  You're excused.
12                    THE WITNESS:  Thank you, sir.
13                    THE COURT:  Next witness?
14                    MR. RIVERA:  The Government calls Special Agent
15    Ariel Perez.
16                    MR. SANTOS:  Your Honor, before we begin with this
17    witness, may we approach?
18                    THE COURT:  Of course.
19                    (Bench conference commences.)
20                    MR. SANTOS:  Your Honor, the Government, during
21    its notice of expert witness, produced a report that this
22    witness is going to testify about.  It's in the docket.  The
23    report didn't note pictures or details as to the
24    examination, other than that he conducted a physical
25    examination and shot the firearm.  However, the Government
```

1   has produced to us last Friday pictures that are not

2   included in the report, as to I assume the components that

3   he will testify about.  Nowhere is that outlined in the

4   report what the actual modifications were, any of that

5   information that is commonly seen --

6              THE COURT:  So what's your request?

7              MR. SANTOS:  That it be limited to the scope of

8   what was in the report in accordance with Rule 16 --

9              THE COURT:  Denied.  The pictures will be admitted

10  for the context.

11             MR. SANTOS:  What about the report, Your Honor?

12  Is that limited to the actual -- the firing of the weapon

13  only or --

14             THE COURT:  Well, we'll see.  We'll see.  We'll

15  see.

16             MR. SANTOS:  Yes, sir.

17                 (Bench conference concludes.)

18             THE COURT:  Please take Agent Perez's oath.

19             Will you be needing an interpreter, Mr. Perez?

20             THE WITNESS:  No, sir.

21             THE COURT:  Go ahead.

22             DEPUTY CLERK:  State your name for the record.

23             THE WITNESS:  Ariel Perez Nieves.

24                          ARIEL PEREZ-NIEVES

25      having been first duly sworn, testified as follows:

```
 1                    THE WITNESS:  Yes.
 2                    MR. RIVERA:  Before we begin, Your Honor, may I
 3          have one brief moment to confer, please?
 4                    THE COURT:  Mr. Rivera, you're going to have to
 5          speak a little slower.
 6                    MR. RIVERA:  I'm sorry, Your Honor.  I've been
 7          advised.
 8                    THE COURT:  You know, I'm sorry.  I'm 75 years
 9          old, and I need you to speak slowly For my benefit.
10                    MR. RIVERA:  Understood.  May I please have one
11          minute to confer, please?
12                    THE COURT:  Of course.
13                    MR. RIVERA:  Thank you.
14                        (Pause in proceedings.)
15                    MR. RIVERA:  We appreciate the Court's indulgence.
16          We are ready to proceed, Your Honor.
17                    THE COURT:  You may proceed.
18                             DIRECT EXAMINATION
19          BY MR. RIVERA:
20          Q    Could you please state your full name.
21          A    Ariel Perez-Nieves.
22          Q    Mr. Perez, who is your employer?
23          A    I'm currently employed with HSI Homeland Security
24               Investigation as a special agent since 2002.
25                    THE COURT:  Can you speak a little louder please,
```

```
 1    Mr. Perez.
 2                THE WITNESS:  Yes, sir.
 3    Q    Could you repeat your answer.  Who do you work for?
 4    A    I'm currently a special agent for the Department of
 5         Homeland Security, Homeland Security Investigations,
 6         since 2002.
 7    Q    What is your position with HSI?
 8    A    I'm a special agent.
 9    Q    During your tenure at HSI, have you always been a
10         special agent?
11    A    With HSI, yes, sir.
12    Q    Before joining HSI in 2002, where did you work?
13    A    I was immigration inspector for one year.
14    Q    And before that?
15    A    Before that, I was a police officer for the Department
16         of Veterans Affairs in San Juan, Puerto Rico.  Prior to
17         that, I was active duty military.
18    Q    How long were you with the Department of Veterans
19         Affairs?
20    A    Little bit over five years.
21    Q    And how long were you active duty military?
22    A    Eight years, five months, and three days.
23                THE COURT:  You got it down pat.
24                THE WITNESS:  Yes, sir.
25    Q    Currently, Special Agent Perez, what are your duties at
```

```
 1            HSI?
 2     A      I'm currently the acting group supervisor for the
 3            public safety group.
 4     Q      Have you received any training in order to become a
 5            firearms instructor or firearms examiner?
 6     A      Yes, sir.  I'm a certified firearm instructor since
 7            2007.  I have attended recertification three times
 8            since then.  I have attended three times also the Field
 9            Maintenance Armor Training.  I have attended training
10            at the Mid South Shooting Academy three times, Rogers
11            Shooting School once.  And I'm also a firearms examiner
12            since 2019.
13     Q      What did you learn at the Field Maintenance Armor
14            course.
15     A      We do maintenance of the Government weapons to make
16            sure they are functioning correctly, and inspections
17            yearly.
18     Q      What other courses have you taken regarding firearms?
19     A      The basic -- you know, in the military, firearms use
20            and maintenance.  The weapons handling, weapons use,
21            safety.  The Field Maintenance Armor Training, I've
22            been three times through it.  And as a firearms
23            examiner, we are trained to verify the safety and
24            operations of seized weapons.
25     Q      How did you become a firearms examiner?
```

```
 1    A    We are required to have -- we were required to be a
 2         firearm instructor, a field maintenance armor, a
 3         minimum of 240 hours of training with the armors at the
 4         office of firearms and tactical programs.  I attended
 5         the Glock basic and advanced armor training.  And then
 6         after that, OFTP certifies us as examiners.
 7    Q    How many training hours have you received to be a
 8         firearm examiner?
 9    A    Over 350 hours.
10    Q    Can you give us some detail as to what you've learned
11         during those 350 hours of training?
12    A    We verify the seized weapons for safety to make sure
13         they are operational and safe to operate, and then we
14         do firearm testing to see if they operate.
15    Q    How many firearm testings have you done?
16    A    I've been part of over 500 firearms.
17    Q    Do you have any training specifically with machine
18         guns?
19    A    Yes.  Usually I -- over 50 percent of those are machine
20         guns, the ones that we test.  I have training in the
21         military and in DHS for the use of machine guns also.
22    Q    Can you expand on what kind of training you receive
23         specifically as to machine guns?
24    A    You know, weapons handling and firing of machine guns.
25    Q    Can you define for us what a machine gun is?
```

```
 1    A    If -- any weapon that with one single pull of the
 2         trigger fires more than -- two or more rounds is
 3         considered a machine gun.
 4    Q    And how many machine guns have you inspected?
 5    A    Over -- inspected?  Over 250.
 6    Q    Have you received any accreditation or certification of
 7         your training?
 8    A    Yes, sir, in -- from DHS in 2019.
 9    Q    Specifically what did you have to do to obtain that
10         specific certification?
11    A    I had to be a firearms instructor, attend the Field
12         Maintenance Armor, attend the Glock Factory Armor
13         Training, and I have over 240 hours -- a minimum of 240
14         hours of training with the armors at DHS.
15    Q    Can you explain for us the process of examining a
16         firearm.
17    A    We first check the firearms, you know, to be safe.  We
18         inspect the barrel to be free of obstructions, the
19         chamber, with gauges to make sure that the calibers are
20         correct and that they are safe to operate.  And then we
21         test fire them.
22    Q    Is that process any different from when you examine a
23         machine gun?
24    A    No.  It's the same process.
25              MR. RIVERA:  Your Honor, at this time the
```

1    Government would move Ariel Perez as an expert in the

2    identification of machine guns.

3              MR. SANTOS:  No objection, Your Honor, as to his

4    qualifications.

5              THE COURT:  Okay.  Like Mr. Escribano, Agent Perez

6    is going to testify as an expert.  I'm going to qualify him

7    as an expert in identification of machine guns.  And as I

8    told you, in addition to his normal testimony, he can give

9    an opinion for your benefit.  Okay?

10             Go ahead.

11   BY MR. RIVERA:

12   Q    Can we show Special Agent Perez Government's

13        Exhibit 22, please.

14             Can we take it out of the bag and hand it to him,

15        please?

16             Special Agent Perez, showing you Government's

17        Exhibit 22, what is that?

18   A    It is a rifle, an AK-47 style.

19   Q    Have you seen that rifle before?

20   A    Yes, sir.

21   Q    How do you know?

22   A    Ah, this rifle was inspected, examined by me.  It has

23        the engraving that we did the testing on it.

24   Q    What was your conclusion once you tested it?

25   A    It was found to be a -- to operate as a machine gun.

1    Q    Can you explain your examination process with the gun

2         in hand?

3    A    We examine the barrel to make sure it was free of

4         obstructions.  We put gauges in the chamber to make

5         sure it's the correct caliber and within limits to

6         operate.  We checked the mechanism and then we test

7         fire it, and at the end we engrave it.

8    Q    Can you show the jury the trigger mechanisms you've

9         mentioned?

10   A    Excuse me?

11   Q    Can you show the jury the trigger mechanisms you've

12        mentioned?

13             THE COURT:  Stand up so that the jury can see.

14   A    Basically this is the trigger that you can see --

15             THE COURT:  Hold it up.  Hold it up so that the

16   jury can see.

17   A    Here's the trigger that operates or fires the weapon.

18        And then from the inside, you can see all the

19        mechanisms and stuff on the inside if you take a close

20        look at it.  This is the selector lever where you

21        select the safe, auto or semi-auto.  And then from this

22        side, you can see the pin that holds the automatic sear

23        in the weapon.  It's like three pins in here.  This

24        bottom one is the automatic sear pin that holds the

25        sear in place.

```
 1    Q    Okay.  You mentioned multiple firearm parts.  What is
 2         the selector lever?
 3    A    The selector lever takes -- this part over here, it
 4         takes the weapon between safe, semi or auto.  Depends
 5         which weapon.
 6    Q    When you say "auto," what do you mean?
 7    A    Automatic, as a machine gun and fires more than one
 8         round with one single pull of the trigger.
 9    Q    So what would one have to do to make it shoot as an
10         automatic?
11    A    Just put it in the middle, which is auto in this type
12         of rifle.  Just put it in the middle, pull and hold the
13         trigger.
14    Q    You mentioned a pin.
15              THE COURT:  Excuse me.  Excuse me.  That lever
16         that you mention about that you can change from safe to
17         semi-automatic to automatic, does it indicate -- for
18         example, does it indicate that when you put it in a
19         particular position, the weapon will fire automatically?
20              THE WITNESS:  In the case of this rifle -- all of
21         them are different.  But in the case of this rifle, it's
22         just got like little dash lines that you can tell.  But it
23         doesn't have anything in writing.  It's just a little dash
24         line that you can see.
25              THE COURT:  Okay.  A dash line for each?
```

1           THE WITNESS:  It has a dash line for -- in the

2    middle, which is auto, and you have a dash line on the

3    bottom which is semi-auto.

4           THE COURT:  Okay.

5    BY MR. RIVERA:

6    Q    You mentioned pins related to the sear.  First of all,

7         what is an automatic sear?

8    A    An automatic sear is a device that, when it's in place,

9         it let's the weapon function as an automatic rifle or

10        machine gun.

11   Q    Does this firearm have one of those?

12   A    Yes, sir.

13   Q    Now, you've mentioned a pin of the automatic sear.

14        What does that pin do?

15   A    The pin holds the automatic sear in place.  It's --

16        basically does that.

17   Q    Is that pin visible from the outside?

18   A    In this rifle, you can see it, yes, it's visible.

19   Q    Can we hand Special Agent Perez Government's

20        Exhibit 24, please.

21          THE COURT:  Excuse me, excuse me.  You said that

22   the pin was visible from the outside.  And the pin is what

23   holds the automatic sear in place.  Could you show --

24          THE WITNESS:  (Complying.)

25          THE COURT:  Can it be seen with the naked eye or

```
1    do you have to look inside the weapon?
2              THE WITNESS:  I mean, it just -- in this one, you
3    know, the buttstock is -- well, this retractor is blocking
4    it there, but if you look at it --
5              Right here, you can see on both sides, you can see
6    the pin that holds the sear.
7              THE COURT:  And you can see it from the outside.
8              THE WITNESS:  Yes, sir.
9              THE COURT:  Okay.  And when you say it holds the
10   sear, it's the automatic sear?
11             THE WITNESS:  Yes, sir.
12             THE COURT:  Okay.  Thank you.
13   BY MR. RIVERA:
14   Q    As part of your examination, did you test fire this
15        gun?
16   A    Yes, sir.
17   Q    How does this gun operate differently from a
18        semi-automatic firearm?
19   A    When you pull the trigger and you hold it back, it will
20        fire two or more rounds.
21   Q    How does that compare with the firearm being a machine
22        gun?
23   A    It's considered a machine gun when it fires two or more
24        rounds with one single pull of the trigger.
25   Q    Can we hand Special Agent Perez Government's
```

```
 1              Exhibit 24, please.
 2                   THE COURT:  Agent Perez, do you know if, when this
 3      automatic -- when this rifle was manufactured, when it was
 4      manufactured, was it --
 5                   THE WITNESS:  Ah --
 6                   THE COURT:  Wait, wait.  Wait for my question.
 7                   THE WITNESS:  Yes, sir.
 8                   THE COURT:  Was it manufactured with the automatic
 9      capability?
10                   THE WITNESS:  I cannot tell, sir.
11                   THE COURT:  Okay.  All right.
12      BY MR. RIVERA:
13      Q    Showing you Government's Exhibit 24, Special Agent
14           Perez.  What is that?
15      A    This is an AK-47 style rifle magazine that holds the
16           bullets for the magazine and feeds the chamber.
17      Q    What kind of ammunition does that magazine hold?
18      A    It should be 7.62 x 39 caliber.
19      Q    Does that magazine fit the firearm you just held in
20           your hand?
21      A    Yes, sir.
22      Q    Can we please show defense counsel Government's ID 29,
23           please.
24                   MR. SANTOS:  Your Honor, we would have an
25      objection as to this --
```

```
 1                    THE COURT:  Overruled.
 2                    MR. SANTOS:  Well, Your Honor, can I state --
 3                    THE COURT:  Overruled.  We talked about it at
 4      sidebar.  Overruled.
 5      BY MR. RIVERA:
 6      Q    Can we show the witness Government's ID 29, please.
 7                    DEPUTY CLERK:  Judge, can it be shown to the
 8      witness?
 9                    THE COURT:  Just the witness.
10                    MR. RIVERA:  Just the witness, please.
11      BY MR. RIVERA:
12      Q    Special Agent Perez, do you see Government's ID 29 on
13           your screen?
14      A    Yes, sir.
15      Q    Do you recognize it?
16      A    Yes, sir.
17      Q    How do you recognize it?
18      A    It is the same exhibit that I was just holding
19           previously.  And I believe I took that picture.
20      Q    Is this a fair and accurate depiction of the firearm
21           you just held in your hand?
22      A    Yes, sir.
23                    MR. RIVERA:  Your Honor, we move Government's
24      ID 29 into evidence as Government's Exhibit 29.
25                    THE COURT:  Objection?
```

```
 1              MR. SANTOS:  Yes, Your Honor, same objection.
 2              THE COURT:  Overruled.
 3              MR. RIVERA:  Can we please publish to the jury.
 4    BY MR. RIVERA:
 5    Q    Special Agent Perez, showing you Government's
 6         Exhibit 29, can you describe for us what we're looking
 7         at?
 8    A    You see the rifle --
 9    Q    One minute, please.
10              Okay.  Please go ahead.  What are we looking at in
11         Government's Exhibit 29?
12    A    You see a picture of the right side of the rifle with
13         the selector lever in the top position, which is -- in
14         the picture looks in the bottom, but it's the top
15         position of the rifle, which is the safe position.
16    Q    Can you circle for us the selector lever, please.
17    A    (Complying.)
18              MR. RIVERA:  Can we please have this marked and
19    printed as Government's Exhibit 29A, please.
20              THE COURT:  Exhibit 29 as marked by Agent Perez is
21    admitted as Exhibit 29A.  He marked the selector.
22    Q    What position is that selector lever in?
23    A    The safe position.
24    Q    Can you explain to us how it moves?
25    A    It moves from top to bottom and from bottom to top.
```

```
1          The middle position, where you see a little dash line,
2          is the auto.  And the bottom position where you see
3          another dash line is the semi-auto in this rifle.
4     Q    Can you mark for us in a different color where the auto
5          position would be?
6     A    (Complying.)
7               MR. RIVERA:  Okay.  Let the record reflect that
8     instead of the different color, the witness has used --
9               THE COURT:  No, he's used the same color.
10              MR. RIVERA:  Right, it's the same color, a line
11    that's blue.
12              THE COURT:  Okay.  What we'll do is we will make
13    this exhibit -- this as marked with the selector lever
14    marked in the safe position and the auto position marked as
15    Exhibit 29A.
16              MR. SANTOS:  Your Honor, I believe he said
17    semi-auto, not auto position.
18              THE COURT:  Is that, that middle one, is
19    semi-auto?
20              THE WITNESS:  It's the auto position, sir.
21              THE COURT:  It's the auto position.
22              MR. SANTOS:  The middle.
23              THE COURT:  The middle dash is the auto position?
24              THE WITNESS:  Yes, sir.
25              THE COURT:  Okay.  Got it.
```

```
1   BY MR. RIVERA:
2   Q    Can you describe for us, can you explain to us what
3        that silver line is on the firearm?
4   A    If you see the selector lever, it's kind of a little
5        indent towards the front, like a little hole.  On the
6        other side it should be like a little piece of metal
7        sticking out so when they take it up and down, it drags
8        across the side of the rifle and it makes that line.
9   Q    Okay.  Can you mark for us --
10            Can we have the screen clear, please.
11            Can you mark for us the semi-auto position.
12  A    (Complying.)
13            MR. RIVERA:  The screen went blank.
14                (Pause in proceedings.)
15            MR. RIVERA:  Everybody can see it?
16            THE JURORS:  Yes.
17            MR. RIVERA:  Thank you.
18  Q    Can you mark for us the semi-auto position in
19       Government's Exhibit 29, please.
20  A    (Complying.)
21            MR. RIVERA:  Let the record reflect that the
22  witness has marked, with a blue line, the semi-auto.  Can we
23  have this printed and marked as Government's Exhibit 29C,
24  please?
25            THE COURT:  No.  29B.
```

```
 1              MR. RIVERA:  Okay.

 2              THE COURT:  Okay.  Marked as Government's

 3   Exhibit 29B where Agent Perez marked the semi-auto position.

 4   BY MR. RIVERA:

 5   Q    Can we please show defense counsel Government's ID 30,

 6        please.

 7              MR. SANTOS:  Same objection, Your Honor.

 8              THE COURT:  Just defense counsel and the witness.

 9   Not the jury.

10              MR. RIVERA:  This line from the previous -- can we

11   have the screen cleared please.

12              MR. SANTOS:  Again, Your Honor, same objection as

13   the last exhibit.

14              THE COURT:  Overruled.  Overruled.

15   BY MR. RIVERA:

16   Q    Special Agent Perez, showing you Government's ID 30, do

17        you recognize this?

18   A    Yes, sir.

19   Q    How do you recognize it?

20   A    It's got the inspection markings on the side.  It's a

21        picture of the same rifle we talked previously.

22   Q    Is this a fair and accurate depiction of the rifle you

23        just held in your hand previously?

24   A    Yes, sir.

25              MR. RIVERA:  Your Honor, we move Government's
```

```
1    ID 30 into evidence as Government's Exhibit 30.

2              THE COURT:  Objection?

3              MR. SANTOS:  Yes, Your Honor.

4              THE COURT:  Overruled.  Admitted as Government's

5    Exhibit 30.

6              MR. RIVERA:  Can we publish it to the jury,

7    please?

8              THE COURT:  Publish it to the jury.

9    BY MR. RIVERA:

10   Q    Can you describe what we're looking at, Special Agent

11        Perez?

12   A    We looking at the same rifle from the left side.

13   Q    And what can we see on the left side of the rifle?

14   A    You can plainly see the pin, the sear pin.

15   Q    Could you please mark the pin sear for us.

16   A    (Complying.)

17             MR. RIVERA:  Please let the record reflect that

18   the witness has marked the pin sear with the blue squiggle.

19             THE COURT:  Would you make that mark larger?

20             MR. RIVERA:  Yes, please.

21             THE WITNESS:  (Complying.)

22             MR. RIVERA:  Could we have this marked and printed

23   as Government's Exhibit 30A, please.

24             THE COURT:  Exhibit 30A is as Exhibit 30 has been

25   marked by Agent Perez where the sear pin is as Exhibit 30A.
```

```
 1    BY MR. RIVERA:

 2    Q    Special Agent Perez, did you complete any reports after

 3         your analysis of this firearm?

 4    A    Yes, sir.

 5    Q    If you were able to see the report, would you be able

 6         to recognize it?

 7    A    Yes, sir.

 8    BY MR. RIVERA:

 9    Q    Can we please show defense counsel Government's ID 20,

10         please.

11              Can defense counsel see Government's ID 20?

12              MR. SANTOS:  Yes.  I have no objection to this.

13              THE COURT:  Without objection, admitted as

14    Government's Exhibit 20.

15              MR. RIVERA:  Can we please publish Government's

16    Exhibit 20 to the jury.

17    BY MR. RIVERA:

18    Q    Special Agent Perez, can you see Government's

19         Exhibit 20?

20    A    Yes, sir.

21    Q    What is it?

22    A    It's the first page of a report of a firearm tested.

23    Q    For which firearm?

24    A    For the firearm that I just had in my hand, the one

25         that we've been questioned.
```

```
 1    Q    Can you please read for us what it says under "Action
 2         Type."
 3    A    "Semi-automatic converted to automatic."
 4    Q    Can you please read for us the caliber of the firearm?
 5    A    "10.69 x 39."
 6    Q    What was the caliber of the firearm?
 7    A    7.69 x 39.
 8    Q    Is that correct in the report?
 9    A    Yes.
10    Q    The caliber firearm that you had with you just now, was
11         it a 7.69 or a 7.62?
12              MR. SANTOS:  Objection, leading.
13              THE COURT:  Overruled.
14    A    It should be a 7.62.
15    Q    What should be a 7.62?
16    A    The rifle that I had in my hand, it was a 7.62.  The
17         report should read a 7.62.
18    Q    Can you tell us what serial number is associated with
19         the firearm, Special Agent Perez?
20    A    It says E, as in echo, F as in fox trot, 5856.
21    Q    Does that serial number match the firearm you just held
22         in your hand, Government's Exhibit 22?
23    A    It should be.
24    Q    Can we scroll down to page 2, please.
25              What was your conclusion regarding the firearm you
```

```
 1           examined?
 2   A    It was found to be a machine gun.
 3   Q    What do you mean by machine gun?
 4   A    With a single pull of the trigger, it fired two or more
 5        rounds.
 6             MR. RIVERA:  No further questions.  Thank you.
 7             THE COURT:  Does that mean that you actually fired
 8   it?
 9             THE WITNESS:  Yes, sir.
10             THE COURT:  In the automatic mode?
11             THE WITNESS:  Yes, sir.
12             THE COURT:  Cross-examination?
13             MR. SANTOS:  Yes, sir.
14                         CROSS-EXAMINATION
15   BY MR. SANTOS:
16   Q    Good morning, Agent Perez.
17   A    Good morning, sir.
18   Q    Mr. Perez, you were not a witness to the events that
19        led to the Defendant's arrest in this case; correct?
20   A    No, sir.
21   Q    And you did not participate in the investigation of
22        this case during the month of February 2023; correct?
23   A    No, sir.
24   Q    And you've been brought here to discuss your
25        examination of the firearm.  That is your sole purpose
```

```
 1            to testify in court.
 2    A    Yes, sir.
 3    Q    And you have no personal knowledge as to the events of
 4            this case.
 5    A    No, sir.
 6    Q    And you have no personal knowledge of who Diego
 7            Fernandez-Santos is.
 8    A    No, sir.
 9    Q    And you've been brought here because of your knowledge
10            and experience with firearms.
11    A    Yes, sir.
12    Q    And from your qualifications that were discussed with
13            the prosecutor, would it be fair to say you have many
14            years of experience with firearms?
15    A    Yes, sir.
16    Q    And that knowledge that you've gained comes through
17            those years of experience and work with firearms?
18    A    And training also, sir, yes.
19    Q    And training.  And you said you've been a firearms
20            instructor for 17 years?
21    A    Since 2007.
22    Q    And firearms examiner since 2019, I gather.
23    A    Yes, sir.
24    Q    Have you testified in court as a firearms examiner
25            previously?
```

```
 1    A    This is the first time I'm required to testify in court

 2         in reference to that.

 3    Q    Okay.  And you said your familiarity with firearms

 4         includes machine guns.

 5    A    Yes, sir.

 6    Q    Now, in this case you were tasked with examining an

 7         item.  Is that correct?

 8    A    The firearm in question.

 9    Q    Yes.  And the purpose of your examination as an expert

10         was to determine whether that item was a machine gun.

11    A    Part of it, yes, sir.

12    Q    And in order to conduct your examination of the subject

13         item, you -- were you provided with any reports of

14         investigation in this case?

15    A    No, sir.

16    Q    And did you talk to any of the agents regarding the

17         facts of the case before you made your conclusion?

18    A    No, sir.

19    Q    And as an expert, you concluded that the subject item

20         was a firearm.

21    A    And a machine gun.

22    Q    Yes, both firearm and a machine gun.

23    A    Yes, sir.

24    Q    Okay.  And you wrote a report with those findings?

25    A    Yes, sir.
```

```
 1    Q    And that report was shown to you just earlier as
 2         Exhibit 20.
 3    A    Yes, sir.
 4    Q    Okay.  And did you review that report prior to
 5         providing testimony here today?
 6    A    Ah, I might have looked at it once, but I don't
 7         remember.
 8    Q    When was the last time you looked at it?
 9    A    Ah, probably when I did the report.
10    Q    So May 8, 2023, to be clear.
11    A    On the date that it's signed.
12    Q    Not since.
13    A    I could have looked at it, but I don't remember.
14    Q    Okay.  So to make your conclusion, you first observed
15         the item; correct?  The firearm?
16    A    Yes.
17    Q    Okay.  And you handled it?
18    A    Yes.
19    Q    And you were able to open the item?
20              THE COURT:  It's -- it's a firearm, you don't -- I
21    mean, everybody knows it's a firearm.
22              MR. SANTOS:  Sure.
23              THE COURT:  So you don't have to call it an item.
24    An item can be this pencil.
25              MR. SANTOS:  Well, Your Honor, he refers to it as
```

1    an item in the report, so I'm just using the language the

2    witness used in the report.

3    BY MR. SANTOS:

4    Q    So you were able to open it?

5    A    Ah, looked at the inside and the mechanism of the

6         rifle, if that's what you're referring to.

7    Q    Yes.  You had to disassemble parts of it to look at it

8         inside; right?

9    A    Not disassemble.  Usually just the top cover in this

10        type of firearms is removed.

11   Q    You removed the dust cover.

12   A    Usually, yes.

13   Q    And in this case, you did so, too; right?

14   A    You have to.

15   Q    You have to.  Okay.  And once you removed the top

16        cover, you observed the components, the interior

17        components of that item.

18   A    Yes, sir.

19   Q    And as an expert, you noted in your report that the

20        item was a semi-automatic firearm that had been

21        converted to automatic.  Is that correct?

22   A    Yes, sir.

23   Q    So by "converted," you mean that from your examination,

24        you identified that the firearm had undergone changes

25        since it was originally manufactured and sold.

| | | |
|---|---|---|
| 1 | A | It was -- it had the sear in place, which is not common |
| 2 | | in these type of weapons that are not manufactured in |
| 3 | | the -- to operate in semi-automatic, usually. |
| 4 | Q | Sure.  But my question, Agent, is that when you say |
| 5 | | "converted" in your report, that means it was changed |
| 6 | | since it was manufactured and sold.  It didn't come |
| 7 | | like that when it was first manufactured. |
| 8 | A | Usually, yes. |
| 9 | Q | And in this case?  Because I'm referring to your |
| 10 | | report.  Not in general.  In this case.  When you say |
| 11 | | "converted," that means -- that means it underwent |
| 12 | | changes. |
| 13 | A | Somebody installed an automatic sear in it. |
| 14 | Q | And you would consider that the conversion; right? |
| 15 | A | Yes, sir. |
| 16 | Q | And that wasn't in place in the rifle when it was sold. |
| 17 | A | I imagine when it was manufactured.  I cannot say when |
| 18 | | it was sold, because I don't know who sold it to -- |
| 19 | Q | That's a fair -- |
| 20 | A | -- your client. |
| 21 | Q | That's a fair correction.  To what -- |
| 22 | A | I don't know in what condition it was when it was sold |
| 23 | | to your client. |
| 24 | Q | But you said you have no personal knowledge as to who |
| 25 | | my client is. |

```
 1   A    That's what I'm saying.  I don't know who sold it to

 2        him or it was -- in what condition it was when it was

 3        sold to your client.

 4   Q    But you don't know if it was sold to my client.  You

 5        don't know anything about the case or my client.

 6   A    No, sir.

 7   Q    Okay.  All right.  So --

 8             THE COURT:  When you say, Agent Perez, that

 9   someone installed the automatic sear, would that installment

10   be when the weapon was manufactured, or later?

11             THE WITNESS:  It seems that it was later, because

12   of the conditions of the weapon.

13   BY MR. SANTOS:

14   Q    And the item -- the firearm, when it was made, it was

15        only in semi-automatic configuration.  Would that be

16        fair?

17   A    I cannot attest to that.

18   Q    So you don't know if it was actually converted?

19   A    It is converted because it has the automatic sear on

20        it.  And it looks like the workings, that it was

21        converted later, because of the indents and the

22        painting.  But I cannot attest if it was originally

23        manufactured as an automatic weapon and then it was

24        removed and then somebody placed it again, but it seems

25        like that was placed afterwards.
```

```
1              MR. SANTOS:  Your Honor, can we show Exhibit 20 to
2     the witness?
3              THE COURT:  Sure.
4              MR. RIVERA:  We can lend a hand to defense
5     counsel.  They can project our screen, if it's --
6              THE COURT:  Go ahead, show it to him.  It's your
7     exhibit.
8     BY MR. SANTOS:
9     Q    So looking at your report, Agent, when it says "Action
10         Type:  Semi-automatic converted to automatic" on the
11         first page, you're not sure whether it was actually
12         converted or not?
13    A    Because of the finish of the rifle, the way it's
14         painted and the markings, it seems that it was
15         converted afterwards.
16    Q    Right.  But my question is if you're sure of that or if
17         it's just a suspicion that you have.
18             MR. RIVERA:  Objection.  Asked and answered.
19             THE COURT:  All he has to do is give an opinion.
20    Overruled.  Sustain the objection.
21    BY MR. SANTOS:
22    Q    Okay.  And you said that the caliber -- in this report,
23         the caliber is 7.69.
24    A    That's a typo, yes.
25    Q    But the actual caliber is 7.62; correct?
```

| | | |
|---|---|---|
| 1 | A | 7.62 x 39. |
| 2 | Q | So this is a typographical error in the report. |
| 3 | A | Yes, sir. |
| 4 | Q | Okay.  Now, you listed the serial number as EF5856; |
| 5 | | correct? |
| 6 | A | That's the marking that that rifle has on it. |
| 7 | Q | But it's not an actual serial number; correct? |
| 8 | A | It could have been placed afterwards, but that's the |
| 9 | | number that was on the seizure documents. |
| 10 | Q | But you'd agree with me that's not an actual serial |
| 11 | | number; that's a Cartouche number. |
| 12 | A | You would have to ask the ATF agent about it. |
| 13 | Q | Okay.  You don't know what that marking represents. |
| 14 | A | It's just the marking that was there. |

15    THE COURT:  Are you saying that it's your opinion
16    that that number was placed after the weapon was
17    manufactured?

18    THE WITNESS:  I'm -- I cannot be sure of it, sir.
19    These type of rifles get -- they place serial numbers in
20    different places.  And it's like -- it's not like standard,
21    so I'm not -- I cannot be accurate if it was placed when
22    manufactured or afterwards.

23    THE COURT:  Okay.
24    BY MR. SANTOS:
25    Q    As an expert, you know the pieces or parts that you

1           identified that were modifications to the firearm?

2    A    The sear, yes.

3    Q    Yes.  And as an expert, you know the names of these

4         parts that you've described to the jury today.

5    A    Of the sear, yes.

6    Q    Yes.  It's not just a sear.  There's other internal

7         components that go into the firearm to make it

8         automatic.

9    A    There's more components in the firearm, but all I have

10        to verify is the sear to ensure that it's automatic.

11   Q    And you not only observed and handled the weapon, you

12        also mentioned that you test fired the weapon.

13   A    Yes, sir.

14   Q    Which means that you had to shoot the firearm to

15        conclude it was a machine gun.

16   A    Yes, sir.

17   Q    As part of your examination, you do not conduct any

18        tests such as fingerprints or DNA, none of that stuff;

19        correct?

20   A    No, sir.

21   Q    So you're not able to give an opinion as to who handled

22        that weapon prior to you receiving it.

23   A    No, sir.

24   Q    And -- or who fired the weapon prior to you receiving

25        it.

```
 1    A    No, sir.
 2    Q    So you're only able to establish that it constituted a
 3         machine gun.
 4    A    Yes, sir.
 5    Q    And as part of your examination on May 8, 2023, you did
 6         not take any pictures of that item, of that weapon.
 7    A    No, not on the date of inspection.
 8    Q    And you did not include any pictures of that weapon in
 9         your report.
10    A    No, sir.
11    Q    By consequence, you did not, on that date that you
12         examined it, that you drafted this report, you did not
13         take any pictures of the parts that you noted were
14         modifications.
15    A    No, sir.
16    Q    And you did not include in your report any explanation
17         as to what the actual modifications were that made the
18         item a machine gun.
19    A    We usually don't, sir.
20              THE COURT:  I'm sorry.  What?
21              THE WITNESS:  We don't.  We just make the report
22    that it functions as a machine gun.
23              THE COURT:  Okay.
24    BY MR. SANTOS:
25    Q    And by "we", you mean your agency, HSI.
```

```
 1    A    Whoever inspects the firearm.
 2    Q    Yes.  But I'm trying to understand when you say "we",
 3         who do you mean by "we"?
 4    A    Well, there's more examiners when we test them, but in
 5         this case, it was me.
 6    Q    But when you say examiners, it's examiners from any law
 7         enforcement agency or your agency?
 8    A    No.  We have more examiners in my agency.
 9    Q    Right.  And you don't list in your report the parts
10         that were modified.
11    A    No.
12    Q    The parts that you testified about today.
13    A    No, sir.
14    Q    And you concluded in your report that the item or
15         subject item examined as we see here has unknown make
16         and unknown model.
17    A    Yes, sir.
18    Q    So the only way that you can identify that the weapon
19         that you examined that day is the same that was shown
20         to you today is by looking at the engraving you made
21         that's listed here as HSI case number.
22    A    Not the HSI case number.  It says FJFET Case No., which
23         is the 23-SJFET-0006.
24    Q    All right.  So that's the number that's engraved in
25         the --
```

```
1    A    Yes.

2    Q    That's the only way you can compare to identify that

3         that's the same that is included in this report.

4    A    Yes, sir.

5    Q    And you said you took some pictures that were shown to

6         you by Government counsel; correct?

7    A    Yes, sir.

8    Q    And would it be fair to say that those pictures were

9         taken after you made that report that is Exhibit 20?

10   A    Yes, sir.

11   Q    And would it be fair to say that those pictures were

12        taken last week?

13   A    Last week or the week prior to that.

14   Q    And did you take these pictures?

15   A    Ah, yes, sir.

16   Q    And in these pictures --

17             Can we show Exhibit 30, please.

18             In these pictures, the rifle -- the dust cover of

19        the rifle has been removed; correct?

20   A    Yes, sir.

21   Q    And the stock, the underfolder stock of the rifle has

22        been pulled back; correct?

23   A    Yes, sir.

24   Q    And that reveals the receiver.

25   A    Clearly.
```

1    Q    Yes.  And when we say the "underfolder of the stock,"

2         that is the butt of the gun; correct?

3    A    Buttstock.

4    Q    Yes.  And normally -- let's not -- scratch that

5         normally.

6              So when you received it, the stock of the rifle

7         was folded in; correct?

8    A    When I received it when?

9    Q    When you conducted your examination of the firearm.

10   A    I cannot recall in what position it was when he handed

11        it to me.

12   Q    You don't remember.  And when you saw it the day you

13        took this picture, when you saw it first, the stock was

14        folded in.

15   A    When they removed it from the bag on that date, it was

16        folded.

17   Q    It was folded in.  So you moved the back and you

18        removed the dust cover to take this picture.

19   A    I believe the dust cover was already loose when they

20        handed it to me.

21   Q    And do you remember if, when you looked at it on May 8,

22        2023, if it was loose like that?

23   A    I cannot recall.

24   Q    You don't know.

25              THE COURT:  No.  He said he cannot recall.

```
 1              MR. SANTOS:  Fair correction, Your Honor.  He

 2      doesn't remember.

 3      BY MR. SANTOS:

 4      Q    And here in this picture that we have in front of us,

 5           you cannot see the stock of the rifle; correct?

 6      A    You could just see where it attaches to the rifle.

 7      Q    Right.  But the full stock, you cannot see it.

 8      A    No, sir.

 9      Q    And you cannot see the barrel of the rifle either.

10      A    No, sir.

11      Q    Because this picture is taken from a very close

12           distance; correct?

13      A    Yes, sir.

14      Q    And the zoom feature is enhanced -- enabled?  The zoom

15           feature, is it enabled in this picture?

16      A    Um, I can't recall it.  I just took the picture.

17      Q    Okay.  And as you mentioned earlier, folding out that

18           stock allows you to fully view the receiver of the

19           rifle.

20      A    To see it clearly.

21      Q    Yes.

22      A    You can see the receiver partially when it's folded.

23      Q    Correct.  And would it be fair to say that these

24           pictures do not depict how you saw the rifle when you

25           received it.
```

```
1    A    Initially when I did the inspection?

2    Q    Yes.

3    A    I cannot recall it -- which way they handed it to me,

4         no.

5    Q    You don't remember.

6              THE COURT:  No.  He said he didn't recall.

7              MR. SANTOS:  I believe remember is a synonym, Your

8    Honor.

9              THE COURT:  He said he didn't recall.

10   BY MR. SANTOS:

11   Q    So I want to talk to you about the modifications of the

12        item that you examined.  Okay?  So from your

13        examination, you were able to identify that the weapon

14        uses a receiver that is originally made in

15        semi-automatic configuration.

16   A    It seems like it, sir.

17   Q    And that means that the metal piece that we're

18        observing here in the middle, um, that middle piece is

19        where the shooting mechanism actuates; right?

20   A    I don't understand what you refer to the middle piece.

21        If you want to point out to it.

22   Q    Well, what we have here is the receiver; correct?

23   A    The picture of the side of the receiver of that rifle,

24        and other parts.

25   Q    Yes.  And in the receiver is where the shooting
```

```
 1              mechanism actuates.
 2      A     It's in the inside, yes.
 3      Q     Yes, where the explosion of the gun goes off and then
 4              shoots the bullet out.
 5      A     The explosion happens --
 6                      (Interruption by the reporter.)
 7                      THE COURT:  Say your answer again.
 8      A     To the first question, in the inside of the receiver is
 9              where the mechanism lays in.
10      Q     Where the mechanism lays in.  Okay.  And that piece is
11              originally made for semi-automatic firing mode.
12      A     It seems like it was originally made firearm
13              semi-automatic because of the markings and the painting
14              and the finish on it.
15      Q     So when it was made, that semi-automatic weapon did not
16              have a small hole in the receiver that facilitates the
17              attachment of the auto sear inside of it.
18      A     It could have or it could have not.
19      Q     You don't know.
20      A     No, sir.
21      Q     Okay.  So to convert the weapon to a machine gun, a
22              person has to -- if it doesn't have that hole, if it
23              comes as a semi-automatic weapon, a person has to drill
24              a small hole in both ends of the receiver; correct?
25      A     It's a hole that goes -- yes, both sides of the
```

```
 1              receiver should have a hole.
 2      Q    I'm sorry?
 3      A    Both ends of the receiver, the left and the right side
 4           of the receiver needs to have the hole.
 5      Q    And if it comes semi-automatic, that hole has to be
 6           drilled in.
 7      A    Yes, sir.
 8      Q    And that hole, then you insert like a steel rod, that's
 9           the sear pin that you were referencing; right?
10      A    No.  That's the -- what you see from the side is just a
11           pin, it's a metal pin.  There's no iron rod.
12      Q    And that pin goes internally through the receiver.
13      A    From one side to the other.
14      Q    Yes.  And that is what holds the mechanism in the
15           interior of the gun.
16      A    It holds the sear pin in the inside of the rifle.
17      Q    And that hole is about five to seven millimeters; would
18           it be fair to say?
19      A    I cannot say.
20      Q    Quarter inch?
21      A    I cannot say.  I don't know what's the diameter.
22      Q    But you would agree, it's small.
23      A    It's a small hole.
24      Q    Small hole.  And the only thing that you see from the
25           outside of this firearm that is a component of the
```

```
 1              automatic firing is that pin right there.

 2    A    Yes, sir.

 3    Q    Okay.  And there are other pins in that receiver that

 4         do not have anything to do with the automatic firing;

 5         correct?

 6    A    That one that specifically holds the pin.  The other

 7         pins hold certain parts of the rifle.

 8    Q    Right.  Like the trigger pin that we can see on the

 9         right side of that.

10    A    Yes, sir.

11    Q    Can you circle that pin for the jury?

12    A    Trigger pin?

13    Q    Yes, please.

14              MR. SANTOS:  Your Honor, let the record reflect

15    that the witness has made a blue circle on the trigger pin.

16              THE COURT:  The record will reflect.

17    BY MR. SANTOS:

18    Q    Okay.  Do you know how to use this monitor, Agent?

19         Never used it; right?  Okay.  I want you to select menu

20         now, and you see those colors in the square?  Choose a

21         different color than blue, please.

22              Okay.  Now, you see that there's also, aside from

23         the trigger pin, there's a hammer pin; correct?

24    A    Ah, I cannot say which one is the hammer pin.

25    Q    Okay.  You noted for us the auto sear pin; right?  To
```

```
 1              the right of that, what's that pin called?
 2        A     I'm not sure.
 3        Q     You don't know?
 4        A     No, sir.
 5        Q     Okay.  What you do know is that that pin does not have
 6              to do with the machine gun conversion.
 7        A     What I do know is that the pin that I pointed out is
 8              the sear pin.
 9        Q     Right.  But the other pin that I'm talking about, the
10              one to the right of it, that doesn't have to do with
11              the automatic firing of the weapon.
12        A     It has -- if it holds the hammer, it has to, because
13              you need the hammer to be able to operate the firearm.
14              But the sear pin is the one that I pointed out to you,
15              and the sear is what makes it a machine gun.
16        Q     Right.  But that hammer pin to make the firearm fire
17              doesn't have to do with automatic firing, it has to do
18              with firing in general.  You need it for the gun to
19              work.
20        A     It's needed for the gun to work, yes.
21        Q     Right.  So it doesn't matter --
22              THE COURT:  Sorry.  We can't understand what
23        you're saying, Mr. Perez.  Please talk more clearly.
24              THE WITNESS:  Okay.
25              THE COURT:  Say it again.
```

```
1    A    It's needed for the firing of the firearm.  But the
2         sear pin is the one that makes it an automatic, when
3         the sear is in place.
4    Q    So to go back to my question.  That other pin that's
5         next to it does not have to do with automatic firing.
6    A    It has to do because it's needed for the firing of the
7         firearm, so if it doesn't have a hammer, it will not
8         operate.
9    Q    Right.  But if it doesn't have a hammer -- let me put
10        it this way --
11             THE COURT:  Well, you know, let's -- let's --
12             MR. SANTOS:  I'm -- I'm --
13             THE COURT:  Wait a minute.
14             MR. SANTOS:  Yes, sir.
15             THE COURT:  That hammer pin is needed to fire the
16   weapon semi-automatic.
17             THE WITNESS:  If that's the hammer pin, it's
18   needed to hold the hammer so the hammer can operate
19   properly.
20             THE COURT:  Okay.
21             THE WITNESS:  The only thing that's needed
22   alone -- that makes it an automatic firearm is because the
23   sear is in place, and you need the sear pin in there.
24             THE COURT:  Okay.  That's it.  Next question.
25
```

BY MR. SANTOS:

Q    These pins come standard with the weapon, the ones that
     are not the auto sear pin.

A    I mean, they are needed, they should be in there when
     you --

Q    Right.  And, um, unless you know that the pin you
     circled earlier with the prosecutor, the auto sear pin,
     unless you know that that pin is the automatic sear
     pin, it looks more or less like the other pins in the
     weapon; right?

A    They are similar than the other pins.

Q    They're similar.

          And because of your expertise with firearms is
     that you are able to tell the specific pin that has to
     do with automatic firing, with the auto sear pin.

A    Any person that has used an automatic weapon and has
     knowledge about it could tell this, that it's an
     automatic weapon, by looking at the pin.  And it gives
     you an indication, but you still have to verify that
     the sear is still installed.

Q    That was my next question, so thank you, Agent.

          So even if you have knowledge with machine guns
     specifically, you can see that pin and suspect that
     it's a machine gun, but you still have to fire it to
     corroborate your suspicion.

```
 1    A    To corroborate, yes.  But usually that pin, if it
 2         doesn't have the sear pin in place, it will fall off.
 3    Q    Okay.  And in this case, you concluded, after firing
 4         it, that it was a machine gun.
 5    A    Yes, sir.
 6    Q    But you cannot state who made the modifications to the
 7         weapon.  Whether it was the manufacturer, somebody else
 8         afterwards, you don't know.
 9    A    No, sir.
10    Q    And you don't know when those modifications were made
11         either.
12    A    No, sir.
13    Q    And to ask you about some of your training, you've
14         attended Nexus training and advance Nexus training as
15         part of your work?
16    A    The Nexus is done by the ATF agents.  I don't do --
17              THE COURT:  He didn't participate in any Nexus.
18    The Nexus was Agent Escribano.  So go on to something else.
19              MR. SANTOS:  Yes, Your Honor.  I was just asking
20    because --
21              THE COURT:  Just go on to something else.
22    BY MR. SANTOS:
23    Q    Agent, I'm going to show you a picture.
24              MR. SANTOS:  Your Honor, may I approach
25    Government's counsel table to show them a picture?
```

```
 1                   THE COURT:  Of course.

 2                   MR. SANTOS:  (Complying.)

 3                   Your Honor, may I use the ELMO to show to the --

 4         or I can approach, if it's easier.

 5                   THE COURT:  That would be easier.

 6                   MR. SANTOS:  (Handing document to the witness.)

 7                   THE COURT:  Let me see what you're using.

 8                   MR. SANTOS:  I have a copy for Your Honor.

 9                   THE COURT:  (Perusing document.)

10         BY MR. SANTOS:

11         Q    Agent, have you seen what I've shown you?

12         A    Yes, sir.

13         Q    Do you recognize it?

14         A    Seems like the rifle that we've been handling here.

15         Q    How does it compare to that rifle that you were handed

16              as Exhibit 22?

17         A    It's similar to it.

18         Q    Similar to it.  Okay.  You don't know if it's the same?

19         A    No, sir, I cannot tell if it's the same or not.

20                   MR. SANTOS:  Your Honor, can we show Exhibit 8 to

21         the agent?

22         Q    All right.  Showing you what's been marked as

23              Exhibit 8.

24                   THE COURT:  Could you eliminate the marking?

25                   MR. SANTOS:  Thank you, Your Honor.
```

```
 1    Q    Showing you Exhibit 8.  How does that compare to the
 2         picture you have in your hand, if you look at the rifle
 3         on the top.
 4    A    It looks like the same, yes.
 5    Q    The same.  Okay.
 6              MR. SANTOS:  Your Honor, I would move now to admit
 7    this picture, and it would be double O, Exhibit double O.
 8              THE COURT:  Admitted as Defendant's Exhibit
 9    double O.
10              Any objection?
11              MR. RIVERA:  Yes, Your Honor.  Lack of foundation.
12              THE COURT:  I'll admit it as Exhibit double O.
13              DEPUTY CLERK:  This one?
14              THE COURT:  No, this one.  (handing document.)
15              MR. SANTOS:  May I publish to the jury, Your
16    Honor?
17              THE COURT:  Yes.
18              Put it on the -- it's on the ELMO.
19    BY MR. SANTOS:
20    Q    All right.  Now, Agent, showing you what has been
21         marked as Exhibit double O.  In this picture, which was
22         taken on February 14, 2023, you cannot see the
23         modification to the firearm; correct?
24              THE COURT:  When was it taken?
25              MR. SANTOS:  February 14, 2023, Your Honor.
```

```
 1    A    Not in the picture.

 2    Q    Not in the picture.  Okay.

 3              MR. SANTOS:  Now, if we can show, Your Honor --

 4    and bear with me for a moment, please, so I can look at the

 5    number of the exhibit -- Government's Exhibit 2, Your Honor.

 6              THE COURT:  Exhibit?

 7              MR. SANTOS:  Two.

 8    BY MR. SANTOS:

 9    Q    Agent, do you see the picture?

10    A    Yes, I do.

11    Q    Okay.  Do you recognize the firearm that's coming out

12         of the blue backpack in the lower part of the picture?

13    A    Seems like the one that we've been -- has been

14         displayed here.

15    Q    Right.  You cannot see the modification to the firearm

16         in that picture.

17    A    Not in plain view, sir.

18    Q    Not in plain view.

19              MR. SANTOS:  I have no further questions, Your

20    Honor -- sorry, sorry.

21              THE COURT:  Redirect?

22              No, that's it.

23              Redirect.  Redirect.

24              MR. RIVERA:  No questions, Your Honor.

25              MR. SANTOS:  It was not about this witness, Your
```

```
1    Honor.  It's approach on a separate matter.

2              THE COURT:  Okay.  Agent Perez, you're excused.

3              Ladies and gentlemen of the jury, let's take our

4    lunch break now.  Please be back at quarter of 1:00.

5              MR. SANTOS:  Your Honor?

6              MR. CARRION:  Your Honor?

7                   (The jury exits the courtroom.)

8              THE COURT:  Please be seated.  What is it that you

9    wanted to talk about?

10             MR. SANTOS:  I'll allow Mr. Carrion to --

11             MR. CARRION:  Your Honor, the witness testified in

12   front of the jury that the firearm had been sold to

13   Mr. Fernandez-Santos.  Your Honor, we would at this time

14   move for a mistrial on that ground.  And if it is denied,

15   we'd ask that when the jury comes back after the recess that

16   the Court give a curative instruction that there has been no

17   testimony whatsoever that Mr. Fernandez was sold a firearm

18   in this case.

19             MR. RIVERA:  And just so the record reflects, that

20   was an answer prompted by defense counsel's questions.

21             MR. SANTOS:  How was it prompted?  I never asked

22   him who sold him the weapon, Your Honor.

23             MR. RIVERA:  If I may proceed.  We can read back

24   the record.  But the question by defense counsel included

25   knowledge as to the time when the firearm was sold.  So the
```

```
 1    selling part of the question was brought in by defense
 2    counsel in a compound question.  The answer that they're
 3    trying to use for a mistrial was prompted by themselves,
 4    Your Honor.
 5              THE COURT:  Denied.
 6              MR. CARRION:  Regardless, a curative instruction
 7    --
 8              THE COURT:  Denied.  You brought it up.
 9                 (Lunch recess was taken.)
10              THE COURT:  You may be seated.  Good afternoon.
11              THE GALLERY:  Good afternoon, Your Honor.
12              THE COURT:  Who is your next witness?
13              MR. RADZINSCHI:  Alexander Tirado-Diaz.
14              THE COURT:  I'm sorry?
15              MR. RADZINSCHI:  Alexander Tirado-Diaz, HSI TFO.
16              MR. CARRION:  Excuse me, Your Honor.  Before this
17    witness testifies, can the defense be permitted the
18    opportunity to show the jury what we weren't able to show
19    yesterday, defense Exhibit AA, which was redacted?
20              THE COURT:  We'll get to that.
21              Bring the jury in, please.
22              COURT SECURITY OFFICER:  Yes, sir.
23                 (The jury enters the courtroom.)
24              THE COURT:  Good afternoon, ladies and gentlemen
25    of the jury.  Please be seated.
```

```
1              Who is your next witness?

2              MR. RADZINSCHI:  Your Honor, the United States

3       calls Alexander Tirado-Diaz.

4              THE COURT:  Mr. Tirado, would you please stand.

5       Please take Mr. Tirado's oath.

6              DEPUTY CLERK:  Please state your name for the

7       record.

8              THE WITNESS:  Alexander Tirado-Diaz.

9                       ALEXANDER TIRADO-DIAZ.

10         having been first duly sworn, testified as follows:

11             THE WITNESS:  Yes, correct.

12                       DIRECT EXAMINATION

13      BY MR. RADZINSCHI:

14      Q    Good afternoon.  Could you please state your full name

15           for the record.

16      A    Alexander Tirado-Diaz.

17      Q    What is your occupation?

18      A    Municipal police officer, San Juan.

19      Q    Do you have any other role?

20      A    At the present, I do.

21      Q    What is that?

22      A    I work at the forensic laboratory of HSI San Juan.

23      Q    Are you considered a TFO?

24      A    Correct, yes.

25      Q    And what is a TFO?
```

| | | |
|---|---|---|
| 1 | A | A TFO refers to a union of local authorities, police |
| 2 | | and Federal authorities, and working jointly as an |
| 3 | | officer, you can do the same work as a Federal officer. |
| 4 | Q | How long have you been an HSI TFO? |
| 5 | A | Since 2017. |
| 6 | Q | What were your responsibilities as an HSI TFO in the |
| 7 | | computer forensic laboratory? |
| 8 | A | There I work with all the digital evidence, computers, |
| 9 | | cell phones, DVR.  Anything that has the capacity to |
| 10 | | store information. |
| 11 | Q | Prior to being an HSI TFO, what other roles have you |
| 12 | | held? |
| 13 | A | I started as a municipal probation officer, and then I |
| 14 | | worked in the intelligence unit, drugs and arrests. |
| 15 | Q | What were your responsibilities in those units? |
| 16 | A | There I worked -- I had the opportunity to work in the |
| 17 | | extraction of information from telephones and search |
| 18 | | warrants, surveillance, arrests. |
| 19 | Q | Is it fair to say, then, that prior to being an HSI |
| 20 | | TFO, you also had opportunity to work with electronic |
| 21 | | evidence? |
| 22 | A | Yes, correct. |
| 23 | Q | Now, what education have you received? |
| 24 | A | Schooling? |
| 25 | Q | As a law enforcement officer. |

```
 1    A    I've attended an academy where I was certified as a
 2         policeman -- police.
 3    Q    Have you had any training with Homeland Security with
 4         respect to electronic evidence?
 5    A    Yes, correct.
 6    Q    What was that?
 7    A    In 2017, when I started to work at the forensic
 8         laboratory at HSI, I received training on how to work
 9         with this evidence and to perform extractions, and then
10         after that I got a certification called A plus.
11    Q    What is that?
12    A    And you have to obtain that certification first before
13         you can attend the HSI academy for forensics.
14    Q    Did you attend the HSI academy for forensics?
15    A    Yes, correct.
16    Q    When was that?
17    A    2022.
18    Q    And what did you do and learn there?
19    A    This academy lasts about seven weeks.  There they teach
20         you to use all of the forensic programs used in the
21         laboratory, and how to work with the evidence.
22    Q    Okay.  Now, have you testified as an expert before?
23    A    At the state level, yes, and also the Federal level.
24    Q    In total, how many times, approximately, have you
25         testified as an expert?
```

```
 1    A    Ten, 12 times.
 2    Q    And it's correct to say, as you just mentioned, that
 3         you testified as an expert in Puerto Rico local courts?
 4    A    Yes, correct.
 5    Q    And you've also testified as an expert in United States
 6         Federal court?
 7    A    Yes, correct.
 8    Q    And on all of those occasions, have you been certified
 9         as an expert?
10    A    Yes.
11    Q    Now, how many extractions, approximately, have you
12         conducted in your career?
13    A    Well, in one fiscal year, I possibly work on 350
14         phones, computers.
15    Q    Is it fair to say that you've done over a thousand
16         extractions?
17    A    Yes.
18    Q    Now, have you received any other training that you
19         haven't mentioned so far with respect to extractions?
20    A    Yes.
21    Q    Like what?
22    A    Mac forensic to work on Mac computers.  And also it is
23         a requirement of the forensic program to stay up to
24         date on software, telephones, cell phones, computers.
25    Q    What kind of software do you use for extractions?
```

| | | |
|---|---|---|
| 1 | A | Well, we have approximately three at present that we |
| 2 | | use for Android and Mac, Apple devices. |
| 3 | Q | Do you use any other programs? |
| 4 | A | Yes, we use others. |
| 5 | Q | Such as? |
| 6 | A | I am not really authorized to talk about forensic tools |
| 7 | | by the legal division. |
| 8 | Q | Is it fair to say that you use programs other than |
| 9 | | Cellebrite? |
| 10 | A | Yes, correct. |
| 11 | Q | Now, and have you received training in all of those |
| 12 | | programs? |
| 13 | A | Yes, correct. |
| 14 | Q | Have you ever given trainings? |
| 15 | A | Yes. |
| 16 | Q | When and where? |
| 17 | A | In the forensic lab, it's been a year now, a new |
| 18 | | forensic officer arrived, I gave him some training on |
| 19 | | how to use the tool, how to preserve evidence, how to |
| 20 | | receive evidence. |
| 21 | | MR. RADZINSCHI:  Your Honor, at this time the |
| 22 | | United States moves to certify Mr. Alexander Tirado-Diaz as |
| 23 | | an expert in forensic extractions. |
| 24 | | MR. CARRION:  Your Honor, may I voir dire the |
| 25 | | witness as to his qualifications. |

```
 1    A     Sure.
 2                MR. CARRION:  Thank you.
 3                      Voir Dire Examination.
 4    BY MR. CARRION:
 5    Q     Good afternoon, Agent Tirado.
 6    A     Good afternoon.
 7    Q     You mentioned that you were qualified as an expert
 8          witness 10 to 12 times in court?
 9    A     Yes, correct.
10    Q     And that includes Federal court.
11    A     Yes.
12    Q     Do you speak English, sir?
13    A     A little.
14    Q     Okay.  And that includes the Federal cases that you --
15          let me back up.  You submitted a resume to the Federal
16          prosecutors in connection with this case.
17    A     Yes, correct.
18    Q     And the cases in which you testified as an expert, you
19          listed them on that resume.
20    A     Yes.
21    Q     And one of those cases includes or is United States v.
22          Francisco Ortiz-Colon.
23    A     Yes, I believe so.
24    Q     And the case number is 20-262, in the District Court of
25          Puerto Rico?
```

```
1    A    I cannot remember right now, but if I included it in my
2         resume.
3    Q    Okay.  Well, you testified in that case as a fact
4         witness; isn't that correct, sir?
5    A    What do you mean by a "fact witness"?
6    Q    A Federal judge, like Judge Besosa, did not qualify you
7         as an expert in that proceeding.
8              MR. RADZINSCHI:  Objection, Your Honor.  May we
9    approach?
10             THE COURT:  Yes.
11                  (Bench conference commences.)
12             MR. CARRION:  Your Honor, I do have the
13   transcripts from that proceeding, and he testified as a fact
14   witness.
15             THE COURT:  So?
16             MR. CARRION:  So he was not qualified as an
17   expert.
18             THE COURT:  Was he asked to be qualified as an
19   expert?
20             MR. CARRION:  No, he was not, Your Honor.
21             THE COURT:  Then I'm not allowing the question.
22             MR. CARRION:  He was listed --
23             THE COURT:  I'm not allowing the question.  If he
24   wasn't asked to testify as an expert, then you can't ask --
25             MR. CARRION:  Your Honor, may I show you one
```

1    thing?  On his expert notice, he said -- this is in his

2    resume, "testified as an expert at trial."

3              THE COURT:  Okay.

4              MR. CARRION:  He wasn't an expert.

5              THE COURT:  All right.  He already testified that

6    he was a fact witness.

7              MR. CARRION:  No, no, he didn't.  He said that I

8    testified as an expert, so I'd move, Your Honor, via

9    sidebar, I'd move to enter Docket 201, which is in Case

10   No. 20 --

11             THE COURT:  No.  Just ask him the question.

12                  (Bench conference concludes.)

13   BY MR. CARRION:

14   Q    Agent Tirado --

15   A    Yes.

16   Q    -- the judge at the trial of Francisco Javier

17        Ortiz-Colon did not qualify you as an expert witness;

18        correct?

19             THE COURT:  No.  I'm not going to allow that

20   question.  You rephrase it.

21   BY MR. CARRION:

22   Q    Were you qualified as an expert witness --

23             THE COURT:  I'm not allowing that question.

24   Rephrase it, and for the reasons I gave you at sidebar.

25

```
1    BY MR. CARRION:

2    Q    Do you remember qualifying as an expert witness in

3         Francisco Javier Ortiz-Colon's trial?

4    A    No, not right now.

5    Q    Would looking at the transcripts of your testimony from

6         that trial refresh your recollection as to whether or

7         not you were qualified as an expert witness --

8              THE COURT:  No, no.  Approach the bench.

9              (Bench conference commences.)

10             THE COURT:  He wasn't asked to be qualified, so he

11   can't answer that type of question.  Period.

12             MR. RADZINSCHI:  He already got his answer, also.

13   He said that he doesn't remember.

14             MR. CARRION:  Well, first he said I testified as

15   an expert, now he's saying "I don't remember."  I should at

16   least be allowed to refresh his recollection as to what he

17   testified about.

18             THE COURT:  Yeah, but don't say that he was

19   qualified as an expert -- that he was not qualified as an

20   expert, because he wasn't asked to be qualified as an

21   expert.

22             MR. CARRION:  We would ask him that, you weren't

23   asked to be qualified as an expert.  I can ask him that

24   question.

25             I'm sorry.  I can ask the question whether or not
```

1     he was asked to be qualified as an expert at that trial.

2               THE COURT:  Let me see.

3               MR. CARRION:  Sure.  So this is going to be on

4     pages 5 to 10 of the transcript.  This is where it starts

5     (indicating).

6               THE COURT:  (Perusing document.)  Would you

7     stipulate that he wasn't qualified as an expert in this

8     trial?

9               MR. RADZINSCHI:  I have no problem with that, Your

10    Honor.

11              THE COURT:  Huh?

12              MR. RADZINSCHI:  I have no problem with that.

13              THE COURT:  Okay.  Stipulated.

14              MR. CARRION:  There's one more that he testified

15    that he was an expert.  I want to just clear that up for --

16              THE COURT:  Well, let me see.

17              MR. CARRION:  I'll bring it to you.  We have the

18    other transcript.

19              THE COURT:  And let me see his resume.

20              MR. CARRION:  Yes.

21              This is actually a suppression hearing, it's not a

22    trial, but pages -- he starts on page 81, goes to 109.

23              MR. RADZINSCHI:  I think with the stipulation, it

24    needs to be clear also that he was never asked to be

25    qualified as an expert.

```
 1                    THE COURT:  Okay.

 2                    MR. CARRION:  And in this case he listed

 3      "Testified as an expert at trial," and then he puts United

 4      States v. Cristobal Lopategui.  There is no state case, that

 5      was the complaint at the state level, so -- but it went

 6      Federal.

 7                    THE COURT:  Big deal.

 8                    MR. CARRION:  I'm just saying that it went

 9      Federal.  But he testified as a fact witness, not as a --

10                    THE COURT:  Okay.  But he wasn't asked to

11      testify --

12                    MR. CARRION:  No, he wasn't proffered as an

13      expert, so just it was --

14                    THE COURT:  Okay.

15                       (Bench conference concludes.)

16                    THE COURT:  Let me see his resume again.

17                    MR. CARRION:  (Complying.)

18                    THE COURT:  (Perusing document.)  Okay.

19                    MR. CARRION:  Your Honor, so don't ask --

20                    THE COURT:  No.

21                    MR. CARRION:  It's just going to be a stipulation,

22      so both Lopategui --

23                       (Bench conference concludes.)

24                    THE COURT:  Ladies and gentlemen of the jury,

25      remember that Mr. -- or Agent Tirado said that he testified
```

```
 1    as an expert both in state and Federal court ten to 12

 2    times?  Remember that, when he said that?

 3              Okay.  Out of those times, he did not testify as

 4    an expert because he was not asked to be testifying as an

 5    expert on two of those occasions.  Okay?

 6              All right.  Next question.

 7    BY MR. CARRION:

 8    Q    Now, sir, you came here prepared to testify about your

 9         work on the Cellebrite program.

10    A    The extraction that was performed.

11    Q    Using the Cellebrite software.

12    A    I'm not authorized to speak about the forensic tool

13         that is used in the laboratory.

14              MR. CARRION:  Your Honor --

15              THE COURT:

16    A    -- by the legal division.

17              MR. CARRION:  Your Honor, may we approach?

18              THE COURT:  No.  Next question.

19    BY MR. CARRION:

20    Q    So you cannot tell the members of the jury whether or

21         not Cellebrite has even certified you for any type of

22         qualifications.

23    A    Yes, I am qualified.  I went to an academy and I was

24         certified for all the software that I use in the

25         laboratory.
```

```
 1   Q    And the academy that you went to, the training was

 2        offered by Cellebrite?

 3   A    Personnel certified on Cellebrite are the ones that

 4        teach the academy.

 5             THE COURT:  What was that?  What was --

 6             THE WITNESS:  That the personnel certified to

 7   myself had come to teach us at the academy.

 8             THE COURT:  And part of that training was on

 9   Cellebrite.

10             THE WITNESS:  Correct.

11   BY MR. CARRION:

12   Q    And you would agree that Cellebrite has different

13        levels of certifications.

14   A    Correct.

15   Q    And what level of certification do you have?

16   A    The first one.

17   Q    So that's the lowest level of qualification.

18   A    Correct.

19   Q    And how many hours of training were required to attain

20        that certification?

21   A    40 hours.

22   Q    And after the 40 hours of training that you received,

23        were you asked to take an exam?

24   A    Correct.

25   Q    And you passed that exam.
```

```
 1    A    Yes, correct.

 2    Q    But you can't say today whether or not you applied

 3         principles and methods that are -- sound principles and

 4         methods that are common in forensic analysis because

 5         you're prohibited from doing so.

 6              MR. RADZINSCHI:  Objection, Your Honor.

 7    Misleading.

 8              THE COURT:  Sustained.

 9    Q    What principles and methods did you use in this case

10         related to your Cellebrite expertise?

11              THE COURT:  Related to -- could you rephrase the

12    question?

13    Q    Yes.  What principles and methods did you use related

14         to your training in Cellebrite in relation to your work

15         in this case?

16    A    The principle of maintaining the extraction intact as

17         it is extracted from the evidence, the cell phone.

18         That it be preserved and that the integrity of the

19         extraction be certain.

20              MR. CARRION:  Your Honor, I submit that this

21    expert has not met the qualification under Rule 702 to be

22    certified as an expert and that opposing counsel has to lay

23    more foundation.

24              THE COURT:  Overruled.

25              Agent Tirado is qualified as an expert in forensic
```

```
1    extractions.

2              MR. CARRION:  And, Your Honor, before we proceed,

3    there are still pending motions related to the testimony

4    that this agent is about to give, and I'd ask that we

5    approach and come to a resolution to those before he

6    continues to testify.

7              THE COURT:  Wait a minute.

8              So remember what I told you about experts.  Not

9    only can they give an opinion about the facts -- they can

10   give testimony about the facts, they can give an opinion for

11   your benefit.  Okay.

12             Okay.  Approach the bench.  What is it that you

13   want?

14                  (Bench conference commences.)

15             MR. CARRION:  Your Honor, we had the suppression

16   motion --

17             THE COURT:  What?

18             MR. CARRION:  The suppression motion was still

19   pending related to this testimony, because it's expected

20   that he's going to talk about items that were recovered from

21   a phone outside of the scope --

22             THE COURT:  Oh.  That's denied.

23             MR. CARRION:  Denied.

24                  (Bench conference concludes.)

25             THE COURT:  The motion that you brought up at
```

```
 1    sidebar is denied.

 2              MR. RADZINSCHI:  May I continue, Your Honor?

 3              THE COURT:  Yes, you may.

 4              MR. RADZINSCHI:  Thank you.

 5                   DIRECT EXAMINATION (Cont'd)

 6    BY MR. RADZINSCHI:

 7    Q    Can you walk us through your process for conducting an

 8         extraction?

 9    A    Yes, correct.

10    Q    What is that process?

11    A    Once the case agent, in this case, Mr. Guzman, brings a

12         piece of evidence to the laboratory, we verify, or at

13         least I verify the legality to be able to access the

14         telephone.  If there is a search warrant.  If it was

15         abandoned.

16    Q    In this case, do you recall what the legal authority

17         was for the search?

18    A    Yes, correct.

19    Q    What was it?

20    A    It was a search and seizure warrant.

21    Q    What evidence specifically did you receive in this

22         case?

23    A    Two telephones.

24    Q    And you mentioned that those cell phones were provided

25         to you by Agent Guzman.
```

```
 1    A    Correct.

 2    Q    And he's an HSI agent?

 3    A    Yes, correct.

 4    Q    Now, what did you do with those two phones?

 5    A    Once they are received at the laboratory, I assign a

 6         case number to them, a control number to them, to

 7         maintain control of the evidence that is received at

 8         the laboratory.  Then once I'm ready to work with the

 9         evidence, an evidence number is assigned to the

10         evidence.

11    Q    And do you conduct an extraction?

12    A    Yes, correct.

13              MR. RADZINSCHI:  May I please have Government's

14    Exhibit 28.

15              May I approach the witness with Government's

16    Exhibit 28?

17              THE COURT:  Of course.

18    BY MR. RADZINSCHI:

19    Q    Can you please take the item out of the bag.

20    A    (Complying.)

21    Q    Do you recognize this item?

22    A    Yes, correct.

23    Q    Did you put a sticker on this item?

24    A    Yes, correct.

25    Q    What does it say?
```

|   |   |   |
|---|---|---|
| 1 | A | It says Homeland Security Investigations, Computer |
| 2 |   | Forensics Laboratory, and then there's a number, SJ, |
| 3 |   | that is for San Juan, 23 was the fiscal year, and then |
| 4 |   | 232, which is the case number.  And the evidence number |
| 5 |   | follows that, which is cel, CEL, to identify that this |
| 6 |   | item is a cell phone -- because we also receive |
| 7 |   | computers, DVR's, micro SDs -- and 23, which is the |
| 8 |   | year, and then 480, which is the number that is |
| 9 |   | assigned to this piece of evidence and that evidence |
| 10 |   | number is assigned exclusively to this phone. |
| 11 | Q | What is the purpose of that tag, or that sticker? |
| 12 | A | To keep control, because at the laboratory, we receive |
| 13 |   | evidence from different state and Federal agencies, and |
| 14 |   | we have this table, chart, when we put this case |
| 15 |   | number, evidence number, that will show which forensic |
| 16 |   | officer handled or worked on that piece of evidence. |
| 17 | Q | What color is that phone? |
| 18 | A | Gray, and in the front, the screen around it, black. |
| 19 | Q | And the border? |
| 20 | A | It's like gray, golden -- it's like gray.  It's a shiny |
| 21 |   | gray, silvery gray. |
| 22 | Q | Okay.  May I please have Government's ID 27, please. |
| 23 |   | I'll just ask you to set Government's Exhibit 28 |
| 24 |   | on the side for a moment. |
| 25 |   | And, Your Honor, may the Government approach with |

```
1          Government's ID 27?

2               THE COURT:  Of course.  Any objection to 27?

3               MR. CARRION:  On proper foundation, Your Honor.

4    BY MR. RADZINSCHI:

5    Q    Can you look at the item that's in this bag?

6    A    Yes.

7    Q    What is it?

8    A    It's a Samsung phone.

9    Q    How do you recognize it?

10   A    Because it has the sticker that I adhered to it with

11        the case number that's assigned to it.

12   Q    And what does it say?

13   A    SJ23232Cel23479.

14   Q    Is this one of the phones that you were given, too, by

15        Agent Guzman?

16   A    Yes, correct.

17   Q    Is this one of the phones that you conducted an

18        extraction of?

19   A    Yes, correct.

20             MR. RADZINSCHI:  Your Honor, at this time I'd move

21   to admit Government's ID 27 as Government's Exhibit 27.

22             THE COURT:  Any objection?

23             MR. CARRION:  No objection.

24             THE COURT:  Without objection, admitted as

25   Government's Exhibit 27.
```

```
1    BY MR. RADZINSCHI:
2    Q    Now, just so that the jury is clear, you conducted an
3         extraction of both of these cell phones?
4    A    Yes, correct.
5    Q    And these are the two phones that were given to you by
6         Agent Guzman.
7    A    Yes, correct.
8    Q    Now, I'd like to show the defense counsel -- well, can
9         I get the CD for Government's ID 10.
10              MR. RADZINSCHI:  Your Honor, with the Court's
11   indulgence, may I just have a moment?
12              THE COURT:  Of course.
13                   (Pause in proceedings.)
14              MR. RADZINSCHI:  Your Honor, may we take a
15   five-minute recess?
16              THE COURT:  Let's take a five-minute recess.
17                   (The jury exits the courtroom.)
18                   (Brief recess.)
19              THE COURT:  You may be seated.  Are you ready,
20   Mr. Radzinschi?
21              MR. RADZINSCHI:  Yes, Your Honor.  My apologies to
22   the Court.
23                   (The jury enters the courtroom.)
24              THE COURT:  You may be seated.
25              You may proceed.
```

```
 1                    MR. RADZINSCHI:  Thank you, Your Honor.

 2                    Your Honor, may I retrieve Government's

 3       Exhibit 27?

 4                    And can I approach the witness with Government's

 5       ID 10, which has been shown to defense counsel?

 6                    THE COURT:  ID?

 7                    MR. RADZINSCHI:  Ten.  And it's been shown to

 8       defense counsel.

 9                    THE COURT:  Any objection to ID 10?

10                    MR. CARRION:  On proper authentication, Your

11       Honor.

12                    THE COURT:  Go head, show it to the witness.

13                    MR. CARRION:  And just renewing our prior

14       objection to the evidentiary admission.

15                    THE COURT:  I'm sorry?

16                    MR. CARRION:  Renewing our prior objection to the

17       evidentiary admission, the suppression issue.

18                    THE COURT:  Well, I'll renew my denial.

19       BY MR. RADZINSCHI:

20       Q    Do you recognize this Government's ID 10?

21       A    Yes, correct.

22       Q    And what is this item?

23       A    A CD.

24       Q    Is that your signature on the CD?

25       A    Yes, correct.
```

```
 1    Q    Does this CD contain any files?

 2    A    Yes, correct.

 3    Q    Did you review those files?

 4    A    Yes, correct.

 5    Q    Where did those files come from?

 6    A    The extraction I performed on the gray cell phone

 7         that's 23480.

 8    Q    Is that Government's Exhibit 28 that's in front of you?

 9    A    Yes, correct.

10    Q    Are the files on that CD true and complete copies of

11         the files pulled from the extraction?

12    A    Yes, correct.

13              MR. RADZINSCHI:  Your Honor, at this time the

14    Government moves to introduce Government's ID 10 as

15    Government's Exhibit 10.

16              THE COURT:  Any objection?

17              MR. CARRION:  Subject to the prior objection.

18              THE COURT:  I'm sorry?

19              MR. CARRION:  Subject to the prior objection.

20              THE COURT:  Overruled.

21              MR. RADZINSCHI:  Your Honor, may I approach the

22    witness for the CD?

23              THE COURT:  Government's ID 10 is now admitted as

24    Government's Exhibit 10.

25              MR. RADZINSCHI:  May I publish to the jury, Your
```

```
1     Honor?

2                THE COURT:  You may.

3     BY MR. RADZINSCHI:

4     Q    Can we pull up Government's Exhibit 10.

5                Mr. Tirado, can you see this on your screen?

6     A    Yes, correct.

7     Q    What is this?

8     A    That's the information from the cell phone that I

9          worked on.

10    Q    And what -- this information corresponds to which cell

11         phone?

12    A    23232, evidence 23480.

13               THE COURT:  Which exhibit is that?

14               MR. RADZINSCHI:  The one on the screen or the one

15    on --

16               THE COURT:  No; the cell phone that he's

17    mentioned.

18               MR. RADZINSCHI:  Government's Exhibit 28.

19               THE COURT:  Oh, okay.  All right.

20    BY MR. RADZINSCHI:

21    Q    Now, Government's Exhibit 28, does it have a make or

22         model on it?

23    A    Yes.

24    Q    What does it say?

25    A    Cloud Mobile.
```

```
1    Q    Okay.  Now, there's a line here that says IMEI1 on
2         Government's Exhibit 10.  What is IMEI?
3    A    This is a unique number that every cellular telephone
4         has, and it's unique to that one telephone.
5    Q    Is that like a serial number?
6    A    A unique serial number that each cell phone has.
7    Q    What is the IMEI number here?
8    A    358467071260490.
9    Q    What does it say for model?
10   A    The model is Stratus C5.
11   Q    And below that, for "Detected Phone Vendor," what does
12        it say?
13   A    Cloud.
14   Q    And is that the same as the one on Government's
15        Exhibit 28?
16   A    Yes, correct.
17   Q    And under "Carrier Name," it says sin servicio, without
18        service.  What does that mean?
19   A    That at the time of the extraction, the device was
20        not -- did not have any service.  It did not have a
21        network service or was not connected to a telephone
22        service network.
23             MR. RADZINSCHI:  And, Your Honor, this exhibit has
24   a translation because of this sin servicio, and it's
25   Government's Exhibit 10E on this CD.
```

```
 1    BY MR. RADZINSCHI:

 2    Q    Now, when it doesn't have service, when it's sin

 3         servicio, what does that mean?

 4    A    That it's not attached to any telephone network.

 5    Q    If it's not attached to a telephone line, how can the

 6         phone be used?

 7    A    It can be connected to Wi-Fi.

 8    Q    Can we please show Government's Exhibit 10A.

 9              MR. RADZINSCHI:  And, Your Honor, the translations

10    for Government's Exhibit 10A appear in Government's

11    Exhibit 10D.

12    BY MR. RADZINSCHI:

13    Q    Do you see this on your screen?

14    A    Yes, correct.

15              THE COURT:  One moment, please.

16                   (Discussion off the record.)

17              THE COURT:  10A and 10B are ID's.

18              MR. RADZINSCHI:  Well, they're all separated on --

19    they're the separate files on the CD.

20              THE COURT:  Oh.  They're part of 10?

21              MR. RADZINSCHI:  Yes, correct.  But each file had

22    to be named individually.

23    BY MR. RADZINSCHI:

24    Q    Do you see this on your screen?

25    A    Yes, correct.
```

```
1    Q    What is this?

2    A    A regular messenger conversation, chat.

3    Q    Do you know what system is used for this chat?  Is it

4         an iMessage, a WhatsApp?

5    A    Just regular message, MSN.

6    Q    Now, what does the green box mean?

7    A    The green box means that the user sent that message.

8    Q    When you mean "the user," does that mean the user of

9         exhibit -- Government's Exhibit 28?

10   A    Yes, correct.

11   Q    Now, can you read for the jury what the green box says?

12   A    "Pablo, it's Diego."

13             MR. CARRION:  Objection.  Hearsay.

14             THE COURT:  Overruled.

15   BY MR. RADZINSCHI:

16   Q    And what is the date of this message?

17   A    3-9-22.  2:05 and 14 seconds a.m.

18   Q    And that's in UTC time?

19   A    UTC zero.

20   Q    That's different than Puerto Rico time; correct?

21   A    Correct.

22   Q    Now, can we go to the next page.

23             And what is this?

24   A    Another message, chat.

25             THE COURT:  I still have the same page on the
```

1   monitor, I think.

2           MR. RADZINSCHI:  It's two different chats where a

3   similar thing is said, but it's different conversations.

4           THE COURT:  Oh, I see.

5   BY MR. RADZINSCHI:

6   Q    Now, what does the green box mean?

7           MR. CARRION:  Your Honor, could we just get a

8   clarification?  What exhibit is this?

9           THE COURT:  This is 10B.

10          MR. CARRION:  10B.

11          MR. RADZINSCHI:  Should be 10A, Your Honor.  10A.

12  It's the second page of 10A.

13          THE COURT:  You said that 10B was the messenger

14  conversation.

15          MR. RADZINSCHI:  Your Honor, 10A -- 10A is these

16  conversations.

17          THE COURT:  Is what?

18          MR. RADZINSCHI:  The conversations are 10A.  So

19  page 1 is the one we just went over, and this is the second

20  page of 10A.

21          THE COURT:  Oh.  The translation is 10B.  Okay.

22  All right.  Okay.

23  BY MR. RADZINSCHI:

24  Q    And what does the green box mean here?

25  A    Message that was sent by the telephone user.

1    Q    What do the blue boxes mean?

2    A    That the message was received by the user of the

3         telephone.

4    Q    Does the green box meant that the user of Government's

5         Exhibit 28 would have sent that message?

6    A    The green one, you asked?

7    Q    Yes.

8    A    Yes, correct.

9    Q    Can you read the green message to the jury?

10   A    "It's me, Diego."

11   Q    What is the date of this message?

12   A    2-9-22.  4:47 and 28 seconds p.m., UTC zero.

13   Q    Now, can we please go to Government's Exhibit 10B.

14             THE COURT:  Exhibit?

15             MR. RADZINSCHI:  10B.

16             THE COURT:  10B.

17   Q    Sorry.  This is the translation.

18             10C.

19             THE COURT:  Please -- 10C is also part of

20   Exhibit A -- Exhibit 10?

21             MR. RADZINSCHI:  Yes, correct.  It's on the CD,

22   Your Honor.

23   BY MR. RADZINSCHI:

24   Q    Now, do you recognize this file?

25   A    Yes, correct.

```
1    Q    What is this?

2    A    A report of the extraction I performed on the

3         telephone.

4    Q    And specifically what is this 10C?

5    A    It's a report of the calls that were made from that

6         telephone.

7    Q    And what does the "from" here mean?

8    A    That it was received.

9    Q    That would mean received to this phone -- to

10        Government's Exhibit 28 from the phone number listed?

11   A    Correct.

12   Q    What does the "to" mean?

13             THE COURT:  No, not -- not --

14             MR. RADZINSCHI:  To.

15             THE COURT:  2 the number or --

16             MR. RADZINSCHI:  T-O.

17             THE COURT:  T-O.

18             THE INTERPRETER:  Oh.

19   A    It's an outgoing call from the phone.

20   BY MR. RADZINSCHI:

21   Q    Now, I want to turn your attention to number 2 on this

22        log.  What does it say for "from"?

23             THE INTERPRETER:  What number does it say it's

24   from?  I'm sorry.

25             MR. RADZINSCHI:  Yes.
```

```
1    A    787-433-4341.

2    Q    What is the time stamp?

3    A    At 7:05 and 3 seconds a.m.

4    Q    And what time zone?

5    A    UTC zero.

6    Q    On what date?

7    A    2-10-2023.

8    Q    What was the duration of this call?

9    A    Two minutes, 21 seconds.

10   Q    And where it says "Status," what does it say?

11   A    That the call was answered.

12   Q    And this says -- to be clear, number 2 is a call from

13        the number ending in 4341 to that phone, Government's

14        Exhibit 28?

15   A    Yes, correct.

16   Q    Now, if we go to the next line, number 3, what does it

17        say in the "to" line?

18   A    You mean the telephone number?

19   Q    Yes.

20   A    787-433-4341.

21   Q    What is the date and time on that call?

22   A    At 2-10-2023, 7:02 and -- 7:05 and -- correction, 7:02

23        and 50 seconds, UTC zero.

24   Q    What was the duration of that call?

25   A    In the morning.
```

```
 1                    One minute 45.

 2    Q    What was the status of that call?

 3    A    The call was answered.

 4    Q    Now, in lines 4, 5, and 6, are these calls between the

 5         Government's Exhibit 28 and the number ending in 4341?

 6    A    Yes, correct.

 7    Q    Those calls also occurred on 2-10-2023?

 8    A    Yes, correct.

 9    Q    Now, turning to the next page, focusing your attention

10         on lines, 12, 13, 19, 20, 21, 22, and 23, are these

11         also calls from Government's Exhibit 28 to a number

12         ending in 4341?

13    A    Correct.

14    Q    And if we could just turn back to the previous page for

15         a moment.

16              The entry for 2-10-23, that's February 10, 2023?

17    A    Correct.

18    Q    Okay.  Now we can turn to page 2.

19              And the items I asked you to look at, all of those

20         calls were answered?

21    A    Correct.

22    Q    And on line 19, there's a call there that was 43

23         minutes and 46 seconds in duration?

24    A    Correct.

25    Q    And that was on February 2, 2023?
```

| | | |
|---|---|---|
| 1 | A | Yes, correct. |
| 2 | Q | Now, if we can turn to page 3, focusing your attention |
| 3 | | on 24, 26, 28, 32, 33, 34, and 36. |
| 4 | | THE INTERPRETER:  32, 34, and 36. |
| 5 | Q | 24, 26, 28, 32, 33, 34, and 36. |
| 6 | | Are these calls between the Government's |
| 7 | | Exhibit 28 and a phone number ending in 4341? |
| 8 | A | Correct. |
| 9 | Q | And the status of all those calls, were those answered? |
| 10 | A | Yes, correct. |
| 11 | Q | And on line 33, there's one call that is 43 minutes and |
| 12 | | 5 seconds? |
| 13 | A | Yes, correct. |
| 14 | Q | And that call was on January 31, 2023? |
| 15 | A | Correct. |
| 16 | Q | If we could please turn to the next page. |
| 17 | | Now, focusing your attention on lines 37, 38, 39, |
| 18 | | 41, 42, 48 and 49. |
| 19 | | THE INTERPRETER:  Could you repeat the numbers. |
| 20 | Q | 37, 38, 39, 41, 42, 48 and 49. |
| 21 | | Are these calls between Government's Exhibit 28 |
| 22 | | and a number ending in 4341? |
| 23 | A | Correct. |
| 24 | Q | Now, most of these calls were answered but not all of |
| 25 | | them; is that right? |

1    A    Yes, that is correct, some were not answered.

2    Q    And the date for these were in January of 2023?

3    A    Correct.

4    Q    Okay.  If we could turn to the next page.

5         Now, I'm going to focus your attention on line 50,

6         53, 54, 55, 56, 57, 58.

7         Are these phone calls between Government's

8         Exhibit 28, that you have in front of you, and a number

9         ending in 4341?

10   A    Correct.

11   Q    And in lines 53 and 54, there are two calls, one

12        lasting 22 minutes and 40 seconds, and another one

13        lasting 22 minutes and 56 seconds?

14   A    Yes, correct.

15   Q    And one of those calls is incoming and the other one is

16        outgoing?

17   A    Yes, correct.

18   Q    And these calls are all from January 2023?

19   A    Yes, correct.

20   Q    Now, this call log also contains other calls; is that

21        right?

22   A    Yes, correct.

23   Q    And those calls on this log are older than the ones

24        that we just went through; is that right?

25   A    Correct.

1    Q    Now, if we could please turn to the next exhibit in the

2         CD.

3              And this will be 10D.

4              What is this document?

5    A    A photograph from the extraction of the cell phone that

6         I received that is here.

7    Q    What is the date on this file?

8    A    The date of the -- the last time it was accessed?

9    Q    The creation date.

10   A    2021, 12 of 21.

11   Q    Is that December 21, 2021?

12   A    Correct.

13   Q    Now, can you describe the photograph that appears here?

14   A    Correct.  It is a female.  It is a video call, and then

15        there's a smaller photograph of a person.

16   Q    And is that a male or female in the left corner?

17   A    It's a male.

18   Q    Okay.  If we can turn to the next page of this exhibit.

19             What appears here on the "record 2"?

20             THE INTERPRETER:  On the record 2?

21   Q    On the record 2.  Where it says "record 2," what

22        appears here?

23   A    A photograph.

24   Q    And can you describe this photograph?

25   A    A woman, a female.  And then in the corner there is a

```
1              picture of a male.  This is from a video call.
2    Q    And what was the creation date of this photograph that
3         appears on the next page?
4    A    12-21-2021.
5    Q    Can you go to the next page, please.
6              That's December 21, 2021, that appears here?
7    A    Yes, correct.
8              MR. RADZINSCHI:  May I have one moment, Your
9    Honor?
10             THE COURT:  Of course.
11                  (Pause in proceedings.)
12             MR. RADZINSCHI:  No further questions from the
13   Government, Your Honor.
14             THE COURT:  Cross-examination?
15             MR. CARRION:  Yes, Your Honor.
16                       CROSS-EXAMINATION
17   BY MR. CARRION:
18   Q    Good afternoon again, Agent Tirado.
19   A    Good afternoon.
20   Q    Of the two cellular phones that you analyzed in
21        relation to this case, you did not personally recover
22        them from the arrestee?
23   A    Negative, no.
24   Q    You have no personal knowledge of where these phones
25        were recovered?
```

```
1    A    No.

2    Q    Now, when the prosecution asked you about the material

3         that you recovered in Government's Exhibit 28, which is

4         the iCloud, they did not present you with any photos of

5         Mr. Fernandez handling firearms.

6              MR. RADZINSCHI:  Objection.  It's not an iCloud,

7    it's a Cloud.

8              MR. CARRION:  I'm sorry.  Cloud Mobile.

9              THE COURT:  Sustained.

10   BY MR. CARRION:

11   Q    When the Government presented you with the extraction

12        reports from Exhibit 28, they did not present you with

13        any photos of Mr. Hernandez handling firearms.

14             MR. RADZINSCHI:  Objection, Your Honor.  The

15   witness provided the extraction reports.

16             THE COURT:  Sustained.

17   BY MR. CARRION:

18   Q    You did not observe on Government's Exhibit 28 any

19        photos of Mr. Fernandez handling firearms.

20             THE COURT:  That's outside the scope.  This is

21   about cell phones, not firearms.

22             MR. CARRION:  I asked if there were any photos on

23   the phone with Mr. Fernandez containing firearms.

24             THE COURT:  Well, okay.  That you can answer.

25   A    No, I do not see any photograph related to weapons.
```

```
1      BY MR. CARRION:
2      Q    You didn't see any text message conversations from that
3           device talking -- or in that device talking about
4           firearms.
5      A    No.
6      Q    And even though a device might not have service, for
7           example, the cellular phone in Government's Exhibit 28,
8           it can still take photos.
9      A    Yes, correct.
10     Q    It can still record videos.
11     A    Correct.
12     Q    It can still connect to the internet.
13     A    Yeah, via Wi-Fi, and also you can use another SIM card.
14     Q    And if it's connected to the internet, you could also
15          send messages on certain types of messenger
16          applications?
17     A    Correct.
18     Q    And you can access social media applications like
19          Facebook or Instagram?
20     A    Correct.
21     Q    Now, you don't personally know when the service to
22          that -- to Government's Exhibit 28 was disconnected.
23     A    No.
24              MR. CARRION:  If I could just ask Government's
25     Exhibit 10D, if we could just display Government's
```

```
1    Exhibit 10D.
2    Q    Now, this screenshot was created on December 21, 2021;
3         correct?
4    A    Correct.
5    Q    Or, in other words, over a year before Mr. Fernandez
6         had been arrested in relation to this case.
7    A    I don't know what his arrest took place.
8    Q    That's fine.  You can take 10D down.  Thank you.
9              Now, you also analyzed a Samsung Galaxy phone in
10        relation to this case.
11   A    Correct.
12   Q    And that device, you assigned it an evidence number --
13        or I'm sorry, a case number, 23479.
14   A    Correct.
15   Q    And that device or that case number, 23479, is a way
16        that you can identify the device on the extraction
17        reports that you create.
18   A    Correct.
19   Q    Okay.  And in this case, you received that phone from
20        TFO Guzman.
21   A    Two telephones.
22   Q    Right.  And you basically conducted the same steps to
23        extract the Samsung phone as you did the device in
24        Government's Exhibit 28, the Cloud device.
25   A    Yes, correct.
```

1    Q    And the reason why or the authorization you had was

2         because you had search warrants to search the devices.

3    A    Yes, correct.

4    Q    And some of the information that you searched for were

5         caller ID information?

6    A    No.  I perform a complete extraction of the telephone.

7    Q    But some of the information that are on devices are

8         caller ID information.

9    A    Correct.

10   Q    Recently called numbers.

11   A    Correct.

12   Q    Text messages.

13   A    Correct.

14   Q    Digital photographs.

15   A    Correct.

16   Q    There could be credit card bills or bank information.

17   A    Yes, correct.

18   Q    And out of all the information that you searched for on

19        Government's Exhibit 27, the Samsung, you found no

20        information related to Mr. Fernandez-Santos.

21   A    No.

22   Q    And, in fact, on direct examination, you did not

23        discuss any of the contents of the Samsung phone.

24   A    No.

25   Q    Now, discussing some of the content of the phones in

|     |     |                                                          |
| --- | --- | -------------------------------------------------------- |
| 1   |     | general, you search for things that are called user      |
| 2   |     | attribution information.                                 |
| 3   | A   | You're asking if I search for that?                      |
| 4   | Q   | Yeah, that's the type of thing you search for.           |
| 5   | A   | In which of the two?                                     |
| 6   | Q   | In both phones, but specifically I'm talking about the   |
| 7   |     | Samsung phone.                                           |
| 8   | A   | Are you asking me if I found any information related     |
| 9   |     | to?                                                      |
| 10  | Q   | User attribution.                                        |
| 11  | A   | No.                                                      |
| 12  | Q   | And of course if you didn't find any of that, that      |
| 13  |     | meant that you didn't find any related to                |
| 14  |     | Mr. Fernandez-Santos.                                    |
| 15  | A   | No.                                                      |
| 16  | Q   | Now, the Cellebrite data, you opened that in the         |
| 17  |     | Cellebrite reader program.                               |
| 18  | A   | Correct.  Once the data is extracted from the            |
| 19  |     | telephone, it is then opened in Cellebrite.              |
| 20  | Q   | And what the Government showed you today were PDF        |
| 21  |     | reports of that data that was extracted from -- in that  |
| 22  |     | case it was the Cloud phone.                             |
| 23  | A   | Correct.                                                 |
| 24  | Q   | But, likewise, you did the same or at least you used     |
| 25  |     | the Cellebrite reader program to look at the contents    |

```
 1            of the Samsung Galaxy phone as well.
 2   A    Yes, correct.
 3   Q    And you would know that that was the extraction that
 4        you performed on that device because it would contain
 5        the case number, 23479.
 6   A    I didn't understand that question.
 7   Q    Yes.  That number, the case number, 23479, that allows
 8        you to know that that extraction report corresponds to
 9        the device that you analyzed.
10   A    Correct.
11            MR. CARRION:  Your Honor, may I have a brief
12   indulgence?
13            THE COURT:  Of course.
14               (Pause in proceedings.)
15            MR. CARRION:  Your Honor, I'm showing to
16   Government counsel defense ID P as in Peter, P as in Peter,
17   double P.
18            MR. RADZINSCHI:  No objection, Your Honor.
19            THE COURT:  Without objection, admitted as
20   defendant's exhibit double P.
21            MR. CARRION:  Your Honor, may I show it to the
22   jury on the projector?
23            THE COURT:  Of course.
24            MR. CARRION:  Thank you.
25
```

```
1    BY MR. CARRION:

2    Q    Now, Agent Tirado, this is the extraction summary

3         related to the extraction that you performed on

4         Government's Exhibit 27, isn't it?

5    A    27?  The black Samsung, correct.

6              MR. CARRION:  Your Honor, I'm going to show

7    Government counsel what has been marked as defendant's

8    exhibit QQ, queen queen.

9              MR. RADZINSCHI:  No objection.

10             THE COURT:  Without objection, admitted as Defense

11   Exhibit QQ.

12             MR. CARRION:  Your Honor, I'm going to place it on

13   the projector.

14             THE COURT:  Yes.

15   BY MR. CARRION:

16   Q    Now, Agent Tirado, this is a photo that was recovered

17        from the extraction of Government's Exhibit 27, the

18        Samsung phone.

19   A    Correct.

20   Q    And this is an example of what you might call user

21        attribution data.

22   A    The photograph?

23   Q    Well, identi -- yes, yes.

24   A    A photograph that was in the cell phone.

25   Q    And you would agree with me that Exhibit QQ displays
```

1        identification information.

2    A    A photograph of a license.

3    Q    And can you please read the name on that license to the

4        jury.

5    A    Johnny Joel Fontanez-Gonzalez.

6    Q    And as far as you know, is Mr. Fontanez-Gonzalez

7        charged with anything in relation to this case?

8            THE COURT:  If you know.

9    A    I don't know.

10           MR. CARRION:  Your Honor, I'm going to show

11   Government counsel what has been marked for identification

12   as Defendant's Exhibit RR, Robert Robert.

13           MR. RADZINSCHI:  No objection, Your Honor.

14           THE COURT:  Without objection, admitted as

15   Defendant's Exhibit RR.

16   BY MR. CARRION:

17   Q    I'm going to remove Defense QQ and I'm going to show

18        the jury Defendant's Exhibit RR.

19            Now, Mr. Tirado, this is also another photo that

20        was recovered from the Samsung device that you

21        analyzed.

22   A    Yes, correct.

23   Q    And it shows a man and a woman, does it not?

24   A    Yes, correct.

25   Q    And the date of this photo is February 25, 2023.

```
1    A    Correct.

2    Q    I'm going to remove that from the projector.

3         I'm going to show Government counsel what has been

4         marked as Defendant's Exhibit SS, S as in Sam.

5              THE COURT:  Any objection?

6              MR. RADZINSCHI:  One moment, Your Honor.

7              THE COURT:  I'm sorry?

8              MR. RADZINSCHI:  One moment.  I'm reviewing the --

9              No objection, Your Honor.

10             THE COURT:  Without objection, admitted as

11   Defendant's Exhibit SS.

12   BY MR. CARRION:

13   Q    Now, Agent Tirado, you would agree that when you

14        extract phones, you can recover the information of

15        certain e-mail accounts that were associated with the

16        device.

17   A    Correct.

18   Q    And in this exhibit, you would also agree that the

19        e-mail account associated with the Samsung device is

20        Jhonnyfonta11@gmail.com?

21   A    As to this, I would have to look at the users that the

22        extraction had, because it is in that part of the users

23        is where it is indicated whether the gmail pertained to

24        the cell phone, to the cell phone.  Because what you're

25        showing me here are the e-mail messages that came into
```

| | | |
|---|---|---|
| 1 | | the cell phone. |
| 2 | Q | Right.  And the account -- the account that's |
| 3 | | associated with the e-mail on the right side of the |
| 4 | | screen where it says account -- |
| 5 | A | Yes, it says Jhonny -- Jhonny and I can't see very well |
| 6 | | what it says after that. |
| 7 | | MR. CARRION:  Your Honor, may I bring the exhibit |
| 8 | | to the witness so that he can see it a little bit better? |
| 9 | | THE COURT:  Of course. |
| 10 | | MR. CARRION:  Thank you. |
| 11 | A | It's dark.  Jhonnyfonta11@gmail.com. |
| 12 | Q | And you would also agree that the time stamp associated |
| 13 | | with that e-mail is February 3, 2023. |
| 14 | A | 2-3-2023, correct. |
| 15 | | MR. CARRION:  Brief indulgence, Your Honor? |
| 16 | | (Pause in proceedings.) |
| 17 | | MR. CARRION:  Your Honor, after I retrieve that |
| 18 | | exhibit, I have no further questions for this witness. |
| 19 | | Thank you, Mr. Tirado. |
| 20 | | THE COURT:  Any redirect, Mr. Radzinschi? |
| 21 | | MR. RADZINSCHI:  No, Your Honor. |
| 22 | | THE COURT:  Agent Tirado, thank you very much for |
| 23 | | your testimony.  You're excused. |
| 24 | | THE WITNESS:  Thank you, and have a good |
| 25 | | afternoon. |

```
 1            THE COURT:  Let's take a 15-minute break.
 2                 (The jury exits the courtroom.)
 3                 (Recess was taken.)
 4            THE COURT:  You may be seated.
 5            Who is your next witness?
 6            MR. RIVERA:  The Government's next witness will be
 7   Rafael Santiago from DTOP, Your Honor.
 8            MR. CARRION:  Your Honor, before we commence,
 9   could we get a proffer of what the testimony will be?  On
10   relevance grounds, on relevance grounds.
11            THE COURT:  No.  We'll see what happens.
12            Bring in the jury.
13                 (The jury enters the courtroom.)
14            THE COURT:  You may be seated, ladies and
15   gentlemen.
16            Who is your witness?
17            MR. RIVERA:  Yes, Your Honor, the Government calls
18   Rafael Santiago to the stand.
19            THE COURT:  Please take Mr. Santiago's oath.
20            DEPUTY CLERK:  Mr. Santiago, please raise your
21   right hand.  State your name for the record.
22            THE WITNESS:  Rafael Santiago-Cruz.
23                      RAFAEL SANTIAGO-CRUZ,
24       having been first duly sworn, testified as follows:
25            THE WITNESS:  I swear.
```

```
1              DEPUTY CLERK:  You may be seated.

2              THE COURT:  Mr. Santiago, please speak clearly and

3       into the microphone.

4              You may proceed, Mr. Rivera.

5              MR. RIVERA:  Thank you, Your Honor.

6                        DIRECT EXAMINATION

7       BY MR. RIVERA:

8       Q    Could you please tell us your full name.

9       A    Rafael Santiago-Cruz.

10             THE COURT:  Speak a little closer to the

11      microphone.

12             THE WITNESS:  Rafael Santiago-Cruz.

13      Q    Mr. Santiago, where do you work?

14      A    I work in the investigations office of the Office of

15           Drivers Services.

16      Q    And how long have you worked at the DTOP?

17      A    In January it will be 21 years working at the

18           Department of Transportation and Public Works, DTOP for

19           it's Spanish acronym, and the last nine years of those,

20           I've been in the investigations office.

21      Q    And what is done in the investigations office?

22      A    At the investigations office, we certify documents such

23           as licenses, driver's licenses, titles, the

24           registration stickers, license plates, for different

25           law enforcement agencies, offices, to indicate whether
```

1          these are authenticate or fraudulent.

2                    In addition to that we also work with a

3          series of requests for information, subpoenas, we

4          certify transactions that are performed in the DAVID

5          system, our office also investigates irregular

6          transactions by employees of CESCO's.  We also regulate

7          inspection centers, the car dealers for license -- car

8          dealerships for licenses, inspection centers,

9          dealerships and histories, agency offices.

10    Q    And what is your current position within the

11         investigative office?

12    A    I work as a complaint investigator.

13    Q    And the things you've said the investigative office

14         does, are those part of your duties as well?

15              THE INTERPRETER:  Are those part of?

16    Q    Your duties as well.

17    A    Yes, yes, they are.

18    Q    Could you explain to the members of the jury what DAVID

19         is?

20    A    Yes, DAVID is the name of the system that we use in

21         public works.  Basically this is the acronym for Driver

22         and Vehicle Information Database.

23    Q    And this database, DAVID, how does it gather its

24         information?

25    A    That information comes from the taxpayers themselves.

```
 1              They must mandatorily fill out a form in accordance
 2              with the transaction they're going to be requesting,
 3              and the employee takes down that information and enters
 4              it into the system or updates it.
 5    Q    And what kind of information do applicants provide?
 6    A    Well, for example, when dealing with driver license
 7              transactions, they have to provide their license
 8              number, the name, physical address, mailing address,
 9              telephone number, e-mail address, and personal
10              information such as their height, weight, skin color,
11              eye color, and all the forms are signed with the date
12              where the information is provided.
13    Q    And those forms, are they accompanied by official
14              documents?
15    A    Yes, yes.
16    Q    What kind of documents?
17    A    Well, in the event that it's a renewal, for example,
18              the person will fill out the form, the application,
19              that will have to be accompanied by a medical
20              certificate, a birth certificate, a Social Security
21              card, evidence of their physical address, and they have
22              to pay for the fees associated with the transaction.
23    Q    Can we show opposing counsel Government's ID 17, Your
24              Honor.
25              THE COURT:  17?
```

1           MR. RIVERA:  17, Your Honor.

2           MR. CARRION:  Upon proper foundation, Your Honor.

3           THE COURT:  Okay.  Go ahead.

4  BY MR. RIVERA:

5  Q    Could we please show Government's ID 17 to

6      Mr. Santiago.

7           Mr. Santiago, do you see Government's ID 17 on

8      your screen?

9  A    Yes.

10  Q    Do you recognize it?

11  A    I do recognize it, yes.

12  Q    How do you recognize it?

13  A    This is a screenshot from the DAVID system that I use.

14      At the bottom right-hand corner is the stamp that we

15      use, and my initials.

16  Q    Is this a fair and accurate depiction of the

17      information you see on your DAVID system?

18  A    That is the information I see, yes.

19           MR. RIVERA:  At this time I move Government's

20  ID 17 into evidence as Government's Exhibit 17.

21           THE COURT:  Any objection?

22           MR. CARRION:  Relevance, Your Honor.

23           THE COURT:  Well, we'll see.  I'll admit it

24  subject to a relevance objection.  You can publish it.

25           MR. RIVERA:  Can the jurors see it?

```
 1                    THE JURORS:  Yes, we're good.

 2                    MR. RIVERA:  Your Honor, there's also a

 3      translation of this document as Government's Exhibit 17A.

 4                    THE COURT:  Also subject to the relevance

 5      objection made by defense.

 6      BY MR. RIVERA:

 7      Q    Mr. Santiago, can you tell us what we're looking at?

 8      A    This is a screenshot of the record of -- may I say the

 9           name?

10      Q    Yes, please.

11                    THE COURT:  Yes.

12      A    Of Naomy Judith Santos.

13      Q    The information contained here, where does it come

14           from?

15      A    The information is provided by the taxpayer, him or

16           herself, through the form they submit at the time when

17           they're going to perform the transaction.

18      Q    So in this case, that would mean that this information

19           was provided by Naomy Judith Santos herself?

20      A    That is correct.

21      Q    Can you please tell us what phone number Ms. Santos

22           provided?

23      A    787-433-4341.

24                    MR. RIVERA:  One moment, Your Honor, please.

25                        (Pause in proceedings.)
```

```
 1              MR. RIVERA:  No further questions, Your Honor.
 2   Thank you.
 3              THE COURT:  Cross-examination?
 4              MR. CARRION:  No, Your Honor.
 5              THE COURT:  Okay.  No cross-examination; and the
 6   relevance objection is overruled.
 7              Mr. Santiago, thank you for your testimony.
 8   You're excused.
 9              THE COURT:  Next witness, please.
10              MR. RADZINSCHI:  Yes, Your Honor.  The United
11   States calls Bureau of Prisons SIS technician, Emanuel
12   Lopez.
13              THE COURT:  Please take Mr.~Lopez's oath.
14              The relevance objection is overruled and Exhibits
15   17 and 17A are admitted.
16              Take Mr.~Lopez's oath.
17              DEPUTY CLERK:  Raise your right hand.  State your
18   name for the record.
19              THE WITNESS:  Emanuel Lopez.
20                        EMANUEL LOPEZ,
21      having been first duly sworn, testified as follows:
22              THE WITNESS:  Yes.
23              THE COURT:  Mr.~Lopez, please speak clearly and
24   close to the microphone.  You can bring your chair forward.
25              Go ahead, Mr. Radzinschi.
```

```
 1              MR. RADZINSCHI:  Thank you, Your Honor.
 2                        DIRECT EXAMINATION
 3   BY MR. RADZINSCHI:
 4   Q    Good afternoon.  Can you please state your full name
 5        for the record.
 6   A    Emanuel Lopez.
 7   Q    What is your current role?
 8   A    I am an officer in the intelligence office at MDC
 9        Guaynabo.
10   Q    What is your official title?
11   A    SIS technician.
12   Q    What are your responsibilities as an SIS technician?
13   A    Well, my primary responsibility is to oversee the
14        safety of employees and of inmates, and of the
15        structure of the institution.
16              THE COURT:  What is MDC Guaynabo?
17              THE WITNESS:  The Federal prison.
18   Q    Is that located here in Puerto Rico?
19   A    Yes.
20              MR. CARRION:  Your Honor, may we approach?
21              THE COURT:  Of course.
22                  (Bench conference commences.)
23              MR. CARRION:  Your Honor, I understand it's
24   obvious where he works.  But to the extent that Your Honor
25   has said that he works at MDC Guaynabo, that that is a
```

1    Federal institution, we'd like to limit any further

2    prejudice that might have caused the jury.

3            It's my understanding that the Government intends

4    to introduce jail calls.  But beyond the relevance objection

5    that we will have, we would ask that the portion of a call,

6    if any, that says this call is -- comes from a Federal

7    prison be not played in front of the jury.  That portion of

8    the call only.  Because of prejudice.

9            MR. RADZINSCHI:  Your Honor, that's the complete

10   call, it's been provided to defense counsel, he had time to

11   object.

12           MR. CARRION:  I'm objecting before it's in

13   evidence.  That's why.

14           THE COURT:  I think it's -- it can be heard -- or

15   I don't know if he's going to play a video.

16           MR. RADZINSCHI:  I was going to play one call,

17   Your Honor, between the Defendant and a number --

18           THE COURT:  It provides context.  And not only

19   that, calls -- they have no constitutional right to privacy

20   to those calls.

21           MR. CARRION:  No, my issue is not with privacy;

22   it's that portion in the beginning where it says it comes

23   from --

24           THE COURT:  Overruled.

25                (Bench conference concludes.)

```
 1                    THE COURT:  Go ahead, Mr. Radzinschi.

 2                    MR. RADZINSCHI:  Thank you, Your Honor.

 3      BY MR. RADZINSCHI:

 4      Q    Before being an SIS technician, did you hold any other

 5           roles at MDC Guaynabo?

 6      A    Yes.

 7      Q    And what roles did you hold?

 8      A    I was a correctional officer four years ago, in 2019.

 9      Q    And how long were you a corrections officer for?

10      A    For four years.

11      Q    What were your responsibilities as a corrections

12           officer?

13      A    It's very similar to what you do in the intelligence

14           office, to ensure the safety of inmates.

15      Q    Now, prior to MDC, did you hold any other positions?

16      A    I've been a member of the military since 2017.

17                    THE COURT:  National Guard or Reserves?

18                    THE WITNESS:  Reserves.

19      Q    And how long have you been part of the Reserves?

20      A    Since 2013.

21      Q    Okay.

22                    THE COURT:  Army Reserves?

23                    THE WITNESS:  Yes.

24      Q    Now, as an SIS technician, do you have access to BOP

25           and MDC systems?
```

```
 1    A    Yes.

 2    Q    What systems?

 3    A    Calls system, e-mail system, and financial, financial

 4         transactions system.

 5    Q    Are those systems known as TRUVIEW and TRUFONE?

 6    A    That is correct.

 7    Q    And are you trained on those systems?

 8    A    Yes.

 9    Q    Are you a custodian of records for the TRUVIEW system?

10    A    Yes.

11    Q    Are you custodian of records for the TRUFONE system?

12    A    Yes.

13              MR. RADZINSCHI:  Your Honor, may I approach

14    defense counsel with Government's ID 11, 12, 13, 14, and 15?

15              THE COURT:  Yes.

16              MR. RADZINSCHI:  May I approach the witness, Your

17    Honor?

18              THE COURT:  Of course.  Any objection,

19    Mr. Carrion?

20              MR. CARRION:  Yes, Your Honor, relevance, and the

21    issue we brought up at sidebar.

22              THE COURT:  Let me -- come to sidebar.

23              (Bench conference commences.)

24              MR. RADZINSCHI:  Your Honor, these are the records

25    for Defendant Diego Fernandez-Santos at MDC, and the
```

1    relevance of these records is that they establish that the

2    Defendant has been calling the phone number ending in 4341

3    since his arrival at MDC in February of last year basically

4    up to the present time.  And that is the phone number that

5    is on the --

6              THE COURT:  No -- okay.  (Perusing document.)

7    What are these names?

8              MR. RADZINSCHI:  These are the contact lists that

9    the Defendant provides to MDC.

10             THE COURT:  Oh, I see.  These are people that --

11             MR. RADZINSCHI:  That he put as his contacts that

12    he can make calls to.

13             THE COURT:  I see.

14             MR. RADZINSCHI:  These are the transactional

15    records -- 12, 13, and 14 are the transactional records,

16    they list the caller, the phone number of the caller.

17             THE COURT:  These are all to the phone number

18    4341?

19             MR. RADZINSCHI:  About 95 percent of them, Your

20    Honor.

21             THE COURT:  Okay.

22             MR. RADZINSCHI:  And then Government's ID 15 is

23    the transactional records which also tie the 4341 number to

24    the Naomy Santos who appears in the DTOP record, and that's

25    money that the defendant received from that person.

```
1              THE COURT:  I see.
2              MR. CARRION:  Your Honor, as to our objection for
3    undue prejudice, I'd just ask that any reference to Federal
4    Bureau of Prisons or inmate be redacted before it be
5    published to the jury, if the Court is going to admit this.
6              THE COURT:  Both your relevant objection and your
7    objection now are overruled.
8                   (Bench conference concludes.)
9              THE COURT:  All right.
10             DEPUTY CLERK:  Your Honor?
11                  (Discussion off the record.)
12             THE COURT:  We need to do something with
13   Exhibit 17 and 17A.  Naomy's full Social Security number is
14   on that exhibit.
15             MR. RADZINSCHI:  It should have been redacted.
16             MR. RIVERA:  We have a redacted version.  If you
17   have unredacted, we can fix that right away.
18             THE COURT:  You can put the last four numbers,
19   okay?
20             All right.  Go ahead.
21             Objection has been overruled, so Government's
22   ID 11, 12, 13, 14, 15 are admitted as Government's
23   Exhibits 11, 12, 13, 14, and 15.
24             MR. RADZINSCHI:  Can we publish, Your Honor?
25             THE COURT:  Yes, you may.
```

```
1    BY MR. RADZINSCHI:

2    Q    Can we please put on the screen Government's

3         Exhibit 11.

4              Now, Mr.~Lopez, what is this document?

5    A    This document is a report on information about the

6         inmate in terms of contacts, telephone numbers and

7         calls.

8    Q    Who provides the information that is populated here?

9    A    The inmate provides it.

10   Q    Does BOP verify this information?

11   A    No.

12   Q    And at the top of this document, we have a registration

13        number.  What is that?

14   A    That is the inmate's identification number.

15   Q    And where it says "start date and end date," what does

16        that mean?

17   A    The start and end of the report.

18              MR. CARRION:  Your Honor, before we proceed, can

19   the witness refer to Mr. Fernandez by his name?

20              THE COURT:  Well, do you know who the inmate with

21   that register number is?

22              THE WITNESS:  Yes.

23              THE COURT:  Who.

24              THE WITNESS:  Diego Fernandez-Santos.

25
```

```
1    BY MR. RADZINSCHI:

2    Q    Now, if we could turn to --

3              THE COURT:  Now, some of -- there are a bunch of

4    names here, and there's checkmarks.  What does that mean?

5              THE WITNESS:  The checkmarks is what was provided

6    in the report.

7              THE COURT:  You said that this information was

8    provided by the inmate in this case, Mr. Fernandez?

9              THE WITNESS:  Yes.

10             THE COURT:  All right.  Let's take the first one.

11   Gladys Agosto, and it's checked "phone and mail," what does

12   that mean?

13             THE WITNESS:  That means that for that contact,

14   the inmate registered Gladys Agosto the telephone number and

15   e-mail address -- excuse me, I should have said the mail.

16             THE COURT:  Does that mean that these people that

17   are listed here are the ones that he has indicated that he

18   can e-mail, phone or mail, depending on the checkmark?

19             THE WITNESS:  That is correct.

20             THE COURT:  All right.

21   BY MR. RADZINSCHI:

22   Q    Now, if we could turn to page 2 of this document.

23             Now, where -- near the bottom of this page, second

24        to last entry, what does it say there?

25   A    "Santos, Naomy."
```

1    Q    And for relationship, what does it say?

2    A    It says "spouse."

3    Q    And for the checkmarks, what is checked off?

4    A    "E-mails and mail," and regular mail.

5    Q    And the relationship as spouse, who would have provided

6         that information for that entry?

7    A    The inmate.

8    Q    Now, if we could turn to page 5 of this document.  Now,

9         the information here, if we look at the entry four from

10        the bottom, what appears there?

11   A    The mail of Santos, Naomy.

12   Q    Who provides that information?

13   A    The inmate.

14   Q    And the relationship status --

15             THE COURT:  So when you say the mail of Santos,

16   Naomy, the mailing address?

17             THE WITNESS:  That is correct.

18   Q    And under relationship status for that entry, what does

19        it say?

20   A    "Spouse."

21   Q    Okay.  Now, if we could turn to page 6 of this

22        document.  What is this?

23   A    This is the list of call registration the inmate has.

24   Q    What does it mean when the status says "active"?

25   A    It means the inmate can make calls to that number.

```
1    Q    And the information here, who provides that
2         information?
3    A    The inmate.
4              THE COURT:  What's his -- let's refer to the
5    inmate by his name.  What is it?
6              THE WITNESS:  Diego Fernandez-Santos.
7    Q    Now, I want to focus your attention on the entry seven
8         from the top, that's 2-18-2023, 8:07 a.m.  Do you see
9         that one?
10             THE INTERPRETER:  From top to bottom?
11             THE COURT:  I don't see that.
12             MR. RADZINSCHI:  Well, I'll underline it on the
13   screen.
14             So that the record is clear, Government counsel
15   has underlined the entry under 2-18-2023 at 8:07 a.m.
16   Q    Do you see that entry?
17   A    Yes.
18   Q    What is the phone number that is there?
19   A    787-433-4341.
20   Q    What is the name that's there?
21   A    Luis De la Rosa.
22   Q    Does BOP verify this information?
23   A    No.
24   Q    So it's just the information provided by Diego
25        Fernandez-Santos in this case?
```

1    A    That is correct.

2    Q    Now, I want to turn your attention -- I want to -- can

3         we please put up Government's Exhibit 12.

4              What is this document?

5    A    This is a report of the calls made by inmate Diego

6         Fernandez-Santos.

7    Q    Now, you have a printed copy in front of you.  What is

8         the date range of this document?

9    A    This covers from February 14, 2023 -- 2-14-2023 to

10        3-16-23.

11   Q    Now, what are the -- what is the number called that

12        appears here on this first page?

13   A    787-433-4341.

14   Q    Is that the number called in August of these calls on

15        this page?

16   A    That's correct.

17   Q    Now, if we could turn to page 3 of this document.

18             THE COURT:  Was this page 1?

19             MR. RADZINSCHI:  That was page 1, Your Honor.

20   Q    The first call that appears on this document, what is

21        it?

22   A    That is on March 1, 2023, to number 787-433-4341.

23   Q    Let me rephrase.  What is the earliest call on this

24        record?

25   A    February 23, 2023.

```
1    Q    And what is the phone number there?

2    A    787-433-4341.

3    Q    And according to this record, who would have made that

4         call?

5    A    Diego Fernandez-Santos.

6    Q    Okay.  And are the majority of the calls on this page

7         to a number ending in 4341?

8    A    That is correct.

9    Q    Are the majority of the calls on this document,

10        Government's Exhibit 12, to a number ending in 4341?

11             THE INTERPRETER:  The interpreter needs repetition

12   of the question.

13   Q    Are the majority of the phone numbers called by Diego

14        Fernandez-Santos on Government's Exhibit 12 to a number

15        ending in 4341?

16   A    That is correct.

17   Q    Now, can we please pull up Government's Exhibit 13.

18             Now, you have a physical copy in front of you.

19        Can you please tell the jury the date range of the

20        calls that appear on this document.

21   A    From February 14, 2023, to November 16, 2023.

22   Q    Now, if we go to the last page of this document, what

23        is the earliest call that appears on this document?

24   A    On March 16, 2023, to the number 787-433-4341.

25   Q    And who made that call?
```

```
1    A    Diego Fernandez-Santos.

2    Q    And if you could review Government's Exhibit 13.

3              To what number are the majority of the calls on

4         this document made to?

5    A    787-433-4341.

6    Q    Now, if we could please pull up Government's

7         Exhibit 14.

8              Now, what is this document?

9    A    This is the call record for inmate Diego

10        Fernandez-Santos from February 14, 2023, to

11        November 27, 2024.

12   Q    Now, if we go to the last page of this document, what

13        is the earliest call that appears here?

14   A    From November 16, 2023, to number 787-433-4341.

15   Q    And who made that call?

16   A    Diego Fernandez-Santos.

17   Q    And what is the total number of calls on this log?

18   A    500.

19   Q    Now, if we go back to page 1, what is the latest call

20        that appears on this log?

21   A    November 26, 2024, to number 787-433-4341.

22   Q    And who made that call?

23   A    Diego Fernandez-Santos.

24   Q    And if we look at the column for duration, what does

25        that mean?
```

1    A    The number of minutes the call lasted.

2    Q    And, in general, what is the duration of these calls to

3         the number 4341?

4    A    Approximately about ten minutes.

5    Q    Now, having reviewed Government's Exhibits 12, 13, and

6         14, can you say approximately how many calls Diego

7         Fernandez-Santos has made to a number ending in 4341

8         since February of 2023?

9    A    Approximately about 1,000 calls.

10   Q    Now, if we could please turn to Government's

11        Exhibit 15.

12             What is this document?

13   A    This document is a record -- financial record and

14        record of visitors of -- a list of the visitors of

15        inmate Diego Fernandez-Santos.

16   Q    Focusing on the money received portion of this

17        document.  Who provides this information?

18   A    The person who sent the money.

19   Q    So looking at the first entry here, what does it say?

20   A    He received $100 from Santos, Naomy.

21   Q    When you say "he," who are you referring to?

22   A    Diego Fernandez-Santos.

23   Q    What was the transaction date?

24   A    November 22, 2024.

25   Q    What is the phone number associated with the sender in

1      that entry?

2   A   787-433-4341.

3   Q   How many entries from a Naomy Santos with a phone

4      number ending in 4341 appear on this page?

5   A   Seven.

6   Q   Now turning to the next page, does this page also show

7      money that Diego Fernandez-Santos received?

8   A   That is correct.

9   Q   How many entries on this page have, as a sender, Naomy

10     Santos, with a phone number ending in 4341?

11  A   Seven.

12  Q   Can you count those again, please.

13          MR. CARRION:  Asked and answered, Your Honor.

14          THE COURT:  Let him count.  Now, Naomy Santos

15  only.

16  A   Seven.

17  Q   Okay.  Are we on the second -- yeah, okay.

18          Can we turn to the next page.

19          Now, looking at this page at the top, what is

20     represented there?

21  A   The money received by inmate Diego Fernandez-Santos.

22  Q   What are the entries here?

23  A   (No response.)

24  Q   The first three transactions at the top, what do they

25     say?

1    A    The money received by the inmate Diego Fernandez-Santos

2         and sent by Santos, Naomy, with telephone number

3         433-4341.

4    Q    Now, turning to the second half of this page where it

5         says "visitor list, visitor name," what is that?

6    A    This is the list of visitors that inmate Diego

7         Fernandez-Santos has approved.

8    Q    Who provides this information?

9    A    The inmate.

10   Q    And the second to the last entry here for Naomy Santos,

11        what is listed as "relationship"?

12   A    Fiancee.

13   Q    And the phone number associated with Naomy Santos?

14   A    787-433-4341.

15   Q    Now, on top of that, there are two other entries with a

16        phone number 4341 and also 4341, what entries are

17        those?

18   A    Rodriguez-Santos, Nahlia, N-A-H-L-I-A, and Rodriguez-

19        Santos, Nia, N-I-A.

20   Q    What is the relationship listed for both of those?

21   A    "Stepdaughter."

22   Q    And in your experience, do children often provide the

23        same phone number as the parent on the visitor list?

24   A    That is correct.

25   Q    We can turn to the next page.

1          How many entries do you see on this page for a

2     visitor name Naomy Santos with the relationship fiancee

3     with a phone number ending in 4341?

4          MR. CARRION:  Objection.  Cumulative, Your Honor.

5          THE COURT:  Overruled.

6   A    12.

7   Q    Are you able to recognize Diego Fernandez-Santos in the

8     courtroom?

9   A    No.

10  Q    Now, I'm going to show defense counsel Government's

11    ID 21.

12         MR. CARRION:  Subject to our prior objection

13  concerning redaction.

14         THE COURT:  Overruled.

15         MR. CARRION:  And relevance.

16         THE COURT:  Overruled.

17         MR. RADZINSCHI:  May I approach the witness,

18  please?

19         THE COURT:  Yes, you may.

20  BY MR. RADZINSCHI:

21  Q    I've just handed you Government's ID 21.  Do you

22    recognize that?

23  A    Yes.

24  Q    What is it?

25  A    It is a call of inmate Diego Fernandez-Santos.

```
1    Q    To what phone number?

2    A    787-433-4341.

3    Q    On what date?

4    A    November 29, 2024.

5    Q    Whose signature appears on that CD?

6    A    My signature.

7    Q    Have you reviewed the contents of the CD?

8    A    Yes.

9    Q    Is it a true and accurate representation of the phone

10        call?

11   A    Yes.

12             MR. RADZINSCHI:  Your Honor, the Government moves

13   to admit Government's ID 21 as Government's Exhibit 21, and

14   we also have a translation, Government's Exhibit 21A, as

15   well as copies for the jury.

16             THE COURT:  Objection?  Any objection?

17             MR. CARRION:  Subject to the prior objection, Your

18   Honor.

19             THE COURT:  Overruled.  Do you have copies?

20             MR. RADZINSCHI:  If I can hand them to the

21   marshal.

22             THE COURT:  Provide them to the Court Security

23   Officer to provide them to the jury.  I need a copy too, if

24   you have one.

25             MR. CARRION:  And for the defense, Your Honor,
```

```
 1    too, as well.
 2              THE COURT:  You don't have a copy?
 3              MR. CARRION:  Not right now, no.
 4              MR. RADZINSCHI:  May I retrieve the exhibit from
 5    the witness, Your Honor?
 6              THE COURT:  Defense needs a copy.
 7              MR. RADZINSCHI:  Yeah.  There should be enough
 8    copies for --
 9              (Handing copy to the defense.)
10              May I retrieve the exhibits from the witness, Your
11    Honor?
12              THE COURT:  Yes.
13              MR. RADZINSCHI:  Your Honor, can we publish
14    Government's Exhibit 21 and play it for the jury?
15              THE COURT:  Yes, you may.
16                   (Audio played.)
17    BY MR. RADZINSCHI:
18    Q    Mr.~Lopez, who made this phone call?
19    A    Diego Fernandez-Santos.
20    Q    To what phone number?
21    A    787-433-4341.
22              MR. RADZINSCHI:  Your Honor, may I have one
23    moment?
24              THE COURT:  Of course.
25                   (Pause in proceedings.)
```

1    Q    One final question.  Is the number you just mentioned,

2         4341, the same one that appears in the exhibits that

3         we've just been going over?

4    A    That is correct.

5    Q    And that's to a Naomy Santos who is listed as a fiancee

6         and spouse?

7    A    That is correct.

8         MR. RADZINSCHI:  No further questions from the

9    Government, Your Honor.

10        THE COURT:  Cross-examination?

11        MR. CARRION:  Yes, Your Honor.

12                    CROSS-EXAMINATION

13   BY MR. CARRION:

14   Q    Good afternoon, Mr.~Lopez.  And I would just ask you if

15        you could refer to Mr. Fernandez by his name and not as

16        an inmate.

17   A    No problem.

18   Q    Okay.  So all the phone calls that you were shown by

19        the prosecutor, the call records, all of them were

20        after February 13, 2023.

21   A    That is correct.

22   Q    All the monetary transactions that you were shown by

23        the prosecutor were after February 14, 2023.

24   A    I do not remember the exact date.

25   Q    I am going to show you Government's Exhibit 15 on the

```
 1              projector.
 2                   THE COURT:  What exhibit?
 3                   MR. CARRION:  One five, 15, Government's
 4      Exhibit 15.
 5      Q    You'd agree with me that the transactions listed on
 6           this document all occurred after February 14, 2023.
 7      A    That is correct.
 8      Q    I'm going to remove page 1 of Government's Exhibit 15,
 9           and I'm going to put down page 2 of the same exhibit.
10                   Likewise, you would agree that all the
11           transactions on this list occurred after February 14,
12           2023.
13                   THE COURT:  One moment, please.
14      A    That's correct.
15                   THE COURT:  One moment.
16                   (Pause in proceedings due to IT issues.)
17                   MR. CARRION:  Your Honor, I can do this the old-
18      fashioned way with the document.
19                   THE COURT:  I'm sorry?
20                   MR. CARRION:  I can do this the old-fashioned way.
21                   THE COURT:  Okay.
22                   MR. CARRION:  May I approach?
23                   THE COURT:  But the jury won't be able to see it.
24                   MR. CARRION:  Well, they can get the gist of what
25      I'm trying to do.
```

```
 1                    THE COURT:  But we have a problem.  The Defendant
 2         is not hearing.
 3                    Okay.  Now he can hear.
 4                    DEPUTY CLERK:  Okay.  Let me check something here.
 5         BY MR. CARRION:
 6         Q    I'm going to put down page 2, Your Honor.
 7                    DEPUTY CLERK:  It's working, Your Honor.
 8                    THE COURT:  Okay.  Page 2.
 9                    THE JURORS:  We're good.
10         BY MR. CARRION:
11         Q    Likewise on page 2 of Government's Exhibit 15, all of
12              these transactions occurred after February 14, 2023.
13         A    That is correct.
14         Q    I'm going to remove that.  I'm going to put down page 3
15              of the same exhibit.
16                    You'd agree with me, sir, that on page 3 of this
17              exhibit, all of the transactions occurred after
18              February 14, 2023.
19         A    That is correct.
20         Q    And lastly, I'm going to put down page 4 of the same
21              exhibit.  And the transactions here all occurred after
22              February 14, 2023.
23         A    That is correct.
24         Q    I'll remove that from the projector.
25                    You'd agree with me that the phone call that you
```

1     listened to between Mr. Fernandez and I guess -- and

2     the female on the call occurred after February 14,

3     2023.

4  A  That is correct.

5  Q  And all of the calls on the call records that you

6     reviewed are generated from a landline.

7  A  (No response.)

8  Q  Not a cellular phone.

9  A  That is correct.

10      MR. CARRION:  No further questions for the

11  witness, Your Honor.  Thank you.

12      THE COURT:  Any redirect?

13      MR. RADZINSCHI:  One question, Your Honor.

14          REDIRECT EXAMINATION

15  BY MR. RADZINSCHI:

16  Q  Mr.~Lopez, how far back does MDC keep inmate phone

17     calls?

18  A  The call report is indefinite, it's not deleted.

19  Q  How about the actual audio?

20  A  Six months.

21      MR. RADZINSCHI:  No further questions, Your Honor.

22      THE COURT:  Mr.~Lopez, thank you for your

23  testimony.  You're excused.

24      Will counsel approach?

25      (Bench conference commences.)

```
1              THE COURT:  Okay.  Do you have any further
2    evidence?
3              MR. RADZINSCHI:  No.  We're going to rest, Your
4    Honor.
5              THE COURT:  Okay.  Before you rest, um,
6    Mr. Carrion, what about Ms. Moringlane's cross-examination?
7              MR. CARRION:  Yes, Your Honor.  So we were given
8    the chronos this morning, as the Court is aware.
9              THE COURT:  Right.
10             MR. CARRION:  We can continue the cross or we can
11   do a direct, you know, whichever way, we'll call her as a
12   witness for the defense.
13             THE COURT:  Even after you cross her?
14             MR. CARRION:  No, your Honor.  If we're allowed to
15   cross her, that will --
16             THE COURT:  Yeah, yeah.  Have you finished
17   crossing her?
18             MR. CARRION:  No, Your Honor, and that would be
19   it.
20             And when her testimony concludes, could I show the
21   exhibit, the double A from yesterday?
22             THE COURT:  There are several exhibits, not only
23   double A that have been redacted that haven't been shown to
24   the jury.  And there's also some exhibits that you want to
25   show to the jury that are substantive evidence of -- I
```

1    forget whose --

2         MR. CARRION:  Agent Gomez.

3         THE COURT:  -- agent Gomez's testimony.  I want to

4    do that all at once.

5         MR. CARRION:  Yes, Your Honor.

6         THE COURT:  So I can do that when you finish with

7    Ms. Moringlane.

8         MR. CARRION:  Very well, Your Honor.

9         THE COURT:  So why don't we do her at 9:00

10   tomorrow morning.  Can you give me a proffer as to --

11        MR. CARRION:  Yes, Your Honor.  So the Government

12   filed a motion saying that we were going to elicit hearsay

13   testimony, but that's actually not entirely correct.  She

14   has to conduct an independent investigation as part of her

15   supervisory duties, and she's expected --

16        THE COURT:  Well, I read through the chronos, and

17   there's a lot of the stuff there about use of drugs and, um,

18   her telling him not to use drugs and attempting to help him

19   come back into society and things like that.  I only saw one

20   entry having to do with her visit to his residence.  Is that

21   what you --

22        MR. CARRION:  I would like to talk about that, and

23   I would like to talk about the eight visits that she

24   conducted.  Ms. Moringlane -- Officer Moringlane testified

25   at the prior suppression hearing that she visited the home

1    -- I can proffer that testimony -- she visited the home

2    eight times.  Her independent investigation revealed that

3    the home was located on the second floor.  Facing the

4    hallway, it's the second door on the left.

5            THE COURT:  Well, let's -- this is the -- what I

6    saw.  That says "PUS, person under supervision, home had two

7    floors.  The first floor composed of a bathroom, the kitchen

8    and living room.  Second floor had a door to the left for

9    the outside area, a bird cage, and a laundry area in the

10   hallway.  There were four bedrooms.  Two to the left and two

11   to the right.  The first bedroom to the left was occupied by

12   his nephew, Diego, until he moved out.  The second bedroom

13   to the left was occupied by the person under supervision.

14   The first bedroom to the right was used as storage, and the

15   second bedroom to the right was occupied by his mother."

16           MR. CARRION:  Yes, yes, that's relevant.  And,

17   also, Your Honor, that is -- it -- it is rebuttal for

18   Sergeant Gomez's testimony that there were only three

19   bedrooms, and that the only other bedroom in the house was a

20   junk room.  That clearly shows --

21           THE COURT:  That shows it's storage.

22           MR. CARRION:  Your Honor, but it also shows that

23   his room was the second on the left, not the first bedroom.

24   And that's -- you know, that is a significant detail.

25           Also, it says in this chronos note that she had

1    met with the Government to prepare testimony.  So if the

2    Government is going to say that we're proffering hearsay,

3    that's just not -- that's not indicated, because this is an

4    independent investigation as a probation officer.

5            THE COURT:  Well, I don't know.  Well, I don't

6    know.

7            MR. CARRION:  Well, she can testify to that,

8    whether it was independent.

9            THE COURT:  I don't know whether she got this

10   information from him or not.

11           MR. CARRION:  She still has to verify and conduct

12   her own information.  Probationers are always going to say

13   something.  They have to do an independent investigation,

14   so -- and I can proffer that she did, Your Honor.

15           MR. RADZINSCHI:  And, your Honor, the Government's

16   position is that the information that defense counsel is

17   trying to elicit here is just a backdoor way of trying to

18   get in hearsay that they clearly can't get in.

19           THE COURT:  Well, that was my question, whether

20   she got this information from him.

21           MR. RADZINSCHI:  Exactly.

22           THE COURT:  From Mr. Fernandez.

23           MR. CARRION:  Your Honor, she has to get

24   information, of course.  But what I'm asking her about is

25   her independent observations.  And I can proffer to the

1    Court that she did go and independently verify and she

2    observed certain things.  She observed him inside of a

3    certain room that is not the room that the Government

4    believes is his bedroom.  And there are other important

5    details that the jury needs to know about so it can make a

6    full decision.

7           And I think when they presented Sergeant Gomez's

8    testimony, that was not -- the three bedrooms and the junk

9    room, that's partially corroborated but it's also partially

10   contradicted, because she's saying there's clearly four

11   rooms and that there's another man's room, and we can

12   proffer that there are personal men's belongings in that

13   other room.

14          So, Your Honor, this is important information,

15   again, and to limit it, trying to say hearsay, Your Honor, I

16   don't think that's -- that is not right, because they cannot

17   just rely on the word of the supervisee, they have to do

18   their own due diligence.

19          MR. RADZINSCHI:  Your Honor --

20          THE COURT:  Well, we'll see what she testifies.

21          MR. RADZINSCHI:  One final thing, Your Honor.  The

22   last site visit by the U.S. Probation Officer was

23   February 1, 2023, two weeks prior to this arrest.  So we

24   would also say that it's not relevant.

25          MR. CARRION:  That's weight, not admissibility.

1    Because they're introducing jail calls from more than a year

2    after the arrest.  This is two weeks before the arrest, Your

3    Honor.  So unless they're trying to say that -- so, I mean,

4    I think it's very relevant, and the jury can weigh how much

5    weight they want to give to it.

6              But there's also an entry from May --

7              MR. SANTOS:  May 2021, Your Honor.  There's an --

8    that entry is where he just got released.  It's an entry

9    from when they are supposed to conduct the first inspection

10   in the home to make -- to establish that it's suitable for

11   them to live in.

12             MR. RADZINSCHI:  Your Honor, that's two years

13   before.

14             MR. CARRION:  Right.  But she talks about the

15   structure of the home.  She talks about the fact that it has

16   four bedrooms.  We should be able to put on rebuttal

17   testimony to rebut Sergeant Gomez's testimony that there was

18   only three bedrooms.

19             THE COURT:  Is this the one that I saw, Mr. --

20             MR. SANTOS:  Yes, Your Honor, I believe so.

21             THE COURT:  Lives with his mother and nephew?

22             MR. SANTOS:  Yes, Your Honor.  And you can see the

23   four bedroom, the two bathrooms.  This is before he's even

24   released when she has to do the -- she has to visit the

25   house, conduct an inspection.  Obviously we're in COVID

1    time, so she did a virtual inspection of the house at the

2    time.  And this proves it's not based on hearsay, because

3    it's not provided by him, because he's still in custody,

4    Your Honor.

5              THE COURT:  All right.  We'll see.  We'll bring

6    her in for cross-examination tomorrow at 9:00.

7              MR. RADZINSCHI:  Okay.

8                   (Bench conference concludes.)

9              THE COURT:  Okay.  Ladies and gentlemen, I'm going

10   to let you go for the evening.  Tomorrow at 9:00 we will

11   complete the cross-examination of Probation Officer Grace

12   Moringlane.  Do you remember her?

13             THE JURORS:  Uh-huh.

14             THE COURT:  So her cross-examination will be

15   completed tomorrow morning at 9:00.  Okay?

16             Remember what I told you at the beginning of the

17   case.  Don't read any news story or article about this case

18   or about anyone involved with it.  Don't listen to any radio

19   program or watch any television show in which this case may

20   be mentioned or anyone involved with it.

21             Don't discuss this case with anyone, not even with

22   your fellow jurors, until you retire to deliberate.  Don't

23   use tools of technology to communicate electronically with

24   anyone about the case, including your family and friends.

25             Okay.  We'll see you tomorrow at 9:00.

1      (The jury exits the courtroom.)

2              THE COURT:  Please be seated.

3              Okay.  Please contact Probation Officer Moringlane

4      to be here tomorrow at 9:00 for her cross-examination.

5      Obviously her testimony hasn't been completed, so don't talk

6      with her about her testimony.

7              Also, there are some matters that the defense has

8      requested that I admit into evidence.  Number 1 is

9      Exhibit AA after it has been redacted.

10             MR. CARRION:  Yes, Your Honor.

11             THE COURT:  And the other matters are the request

12     to -- so that the jury can see, as substantive evidence, the

13     contradictions that agent -- was it Agent Guzman?

14             MR. SANTOS:  Sergeant Rafael Gomez-Aguila.

15             THE COURT:  -- Sergeant Gomez did during his

16     testimony.  I'm still taking a look at that to see, but I

17     know you gave me which ones they are, so I will make that

18     decision, and then we will -- after Ms. Moringlane's

19     cross-examination, Mr. Radzinschi -- well, let's put it this

20     way, after Ms. Moringlane finishes her testimony, will you

21     rest?

22             MR. RADZINSCHI:  Yes, Your Honor.  And with

23     respect to the statements of Rafael Gomez-Aguila that

24     defense counsel want to introduce, the Government would just

25     request, before you make a decision on that, if we could be

1    heard as to the Government's position.

2              THE COURT:  Okay.  Yeah, of course, of course.

3              MR. SANTOS:  And, Your Honor, there was one other

4    exhibit, HH, which was admitted subject to redaction from

5    the transcript of Agent Luis Gomez's testimony at the

6    suppression.  We already prepared it with the redactions.

7              THE COURT:  Okay.  So have everything prepared,

8    redacted, so that they can be admitted redacted.  And after

9    I hear your position on the contradictions by Mr. Gomez,

10   Sergeant Gomez, I will make a decision as to those that you

11   mentioned.  Okay?

12             MR. SANTOS:  Yes, sir.

13             THE COURT:  Okay.  All right.  See you tomorrow at

14   9:00.

15             MR. RADZINSCHI:  Thank you, Your Honor.

16                  (Proceedings conclude at 4:34 p.m.)

17

18

19

20

21

22

23

24

25

```
1    UNITED STATES DISTRICT COURT  )
                                          ss.
2    DISTRICT OF PUERTO RICO        )

3

4                     REPORTER'S CERTIFICATE

5

6            I, TRACY L. BINDER, RPR, Federal Official Court
     Reporter for the United States District Court for the
7    District of Puerto Rico, appointed pursuant to the
     provisions of Title 28, United States Code, Section 753,
8    do hereby certify that the foregoing is a true and correct
     computer-aided transcript of proceedings had in the
9    within-entitled and numbered cause on the date herein set
     forth; and I do further certify that the foregoing
10   transcript has been prepared by me or under my direction.

11           Dated this 12th day of December, 2024.

12

13

14

15   Tracy L. Binder, RPR
     Federal Official Court Reporter

16

17

18

19

20

21

22

23

24

25
```